RUSSEL WILLIAM BURKET

V.

COMMONWEALTH OF VIRGINIA

Record No. 940880

November 4, 1994

*F. William McGraw, Jr. (Cheshire I'Anson Eveleigh; Wolcott, Rivers, Wheary, Basnight & Kelly*, on briefs), for appellant.

*Thomas C. Daniel, Assistant Attorney General (James S. Gilmore, III, Attorney General*, on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

In this appeal, we review the capital murder conviction and sentence of death imposed upon Russel William Burket.

## I.

## PROCEEDINGS

Burket was indicted by a Virginia Beach grand jury for the capital murder of Katherine A. Tafelski and Ashley Tafelski as part of the same act or transaction. Code §§ 18.2-31 and 18.2-10. He was also indicted for sexual penetration with an inanimate object of Katherine Tafelski, malicious wounding of Andrew J. Tafelski, Jr., malicious wounding of Chelsea Brothers, and statutory

burglary. He pled guilty to all the charges against him, reserving his right to challenge on appeal the admissibility of his confession.

Before accepting the guilty pleas, the trial court questioned Burket and made a determination that his pleas were made voluntarily, intelligently, and knowingly. Burket and the Commonwealth submitted to the trial court a stipulation of fact that recited evidence that would have been adduced had the case been tried.

The trial court held a separate hearing to consider evidence before fixing punishments. The trial court also received the probation officer's report in the manner prescribed by law. Upon consideration of the evidence and stipulated facts, the trial court fixed Burket's punishment at death for the capital murder, premised upon findings of both the "vileness" and the "future dangerousness" predicates. Code § 19.2-264.2. The trial court fixed Burket's punishment at a term of life imprisonment for the crime of statutory burglary, a term of life imprisonment for the crime of sexual penetration with an inanimate object, and terms of 20 years imprisonment on each charge of malicious wounding.

We have consolidated the automatic review of Burket's death penalty with his appeal of his capital murder conviction, Code § 17-110.1(A) and (F), and have given them priority on our docket, Code § 17-110.2. Burket has not appealed his non-capital convictions.

## II.

## THE CRIMES

On January 14, 1993, about 2:00 p.m., Terry Cain placed a telephone call to Barbara Pullman, who is Katherine Tafelski's mother. Cain informed Pullman that Cain's three-year-old daughter, Chelsea Brothers, had spent the night with Katherine Tafelski and her children. Mrs. Tafelski had agreed to take Chelsea to school on the morning of January 14, but had failed to do so. Pullman placed a telephone call to her daughter's home, but she received an answering machine recording, "which was not normal." Pullman decided to go to her daughter's residence to ascertain why she had not taken Chelsea to school.

When Pullman arrived at her daughter's home, she was unable to gain entry because the front door was locked. Joan Poillon, who lived in the neighborhood, began to help Pullman gain access to

the residence. As they tried to enter the front door, they heard Chelsea crying. Chelsea was inside the home, but was unable to open the front door because of her age and diminutive stature.

Pullman and Poillon went to the rear of the house and discovered that the back door was open. When they entered the house, Chelsea ran to them crying. They observed that Chelsea had suffered a facial injury.

Pullman and Poillon began to search the house in an attempt to locate Katherine Tafelski; her daughter, Ashley Tafelski, age five; and her son, Andrew J. Tafelski, Jr., age three. Pullman and Poillon found Katherine Tafelski's partially nude body, covered in blood, lying on her bed. It was apparent that she had been struck numerous times in the head and sexually assaulted with some type of object. The white sweatshirt that she had been wearing was ripped in several places and soaked with blood.

Pullman ran to the kitchen area of the residence and placed a telephone call to the police. Poillon continued to search for the children. Poillon entered Ashley Tafelski's bedroom, and discovered Ashley's body lying in her bed with her hand hanging over the side of the bed and a large pool of blood beneath her. It appeared that Ashley had been struck several times in the head with a hard object. A small piece of bone fragment, "coupled with hair and blood," was near the foot of Ashley's bed.

Poillon found Andrew Tafelski, Jr., in his bedroom, lying in the top bunk bed. He was suffering from numerous head and facial injuries, but he was still conscious.

After the police arrived at the residence, Detective Shawn Hoffman and another officer conducted a search of the area surrounding the residence. A trained dog located a track that extended from the rear utility room of the house to a wooded area behind the home. An officer found an old double-barreled shotgun in the woods. The shotgun had been removed from the Tafelskis' residence.

The intruder's apparent point of entry was a door located in the back of the Tafelskis' residence. The door contained numerous fresh tool marks. These tool marks were of a similar pattern and shape as marks found on the bodies of Katherine and Ashley Tafelski.

The bodies of Katherine and Ashley Tafelski were taken to the Norfolk Crime Lab for autopsies and forensic examination. Dr.

Leah Linda Elizabeth Bush, assistant chief medical examiner, performed the autopsies.

The autopsy of Katherine Tafelski's body revealed the following. Her head had been struck six or seven times with an object of significant weight. The skull was completely crushed, and it appeared that massive force had been applied.

She had marks on her right upper inner thigh that, upon observation, appeared to resemble a belt buckle. She had suffered vaginal and anal penetration by an inanimate object. The vaginal penetration was made with an object ranging in diameter from one-half to two inches and penetrating to a length of 21 inches. The object, later identified as an automotive tool[1] about 30 inches long and containing a "screwdriver tip," perforated the victim's posterior vaginal wall, the left iliac artery, the left iliopsoas muscle, the small bowel mesentery, the omentum, the stomach, the left posterior hemidiaphragm, and the left periaortic soft tissue with intimal and medial aortic transection. A gray substance with a greasy consistency was found at the entrance of the victim's anal cavity.

Dr. Bush found a small piece of "bark/wood" while examining the victim's internal organs. Four or five abrasions, two of which contained small lacerations, were present on the victim's right side. Dr. Bush noted that either the blunt force trauma to the victim's head or the injury to her vaginal area and its related perforations would have been sufficient to cause death.

The autopsy of Ashley Tafelski's body revealed the following. Ashley suffered massive head injuries that were inflicted by the same object that was used to kill her mother. She had four or five lacerations to her head. Two of the head wounds evidenced a "knurled" pattern on the skin. One of the wounds to Ashley's head did not break the skin, but crushed the skull underneath. Two of the wounds to Ashley's head evidenced markings consistent with the tool marks found at the point of entry at the residence. Dr. Bush determined that the cause of Ashley's death was blunt force trauma to her head.

Andrew Tafelski, Jr., suffered a double break in his jaw, at the joint and at the tip. He also had a wound above one of his eyes. Chelsea Brothers suffered bruises to her head, face, and body.

A blue washcloth was found in the room near Katherine Tafelski's body. Lynn S. Baird, a forensic scientist, examined the wash-

---

[1] The automotive tool is also described in the record as a "rusted metal pry bar."

cloth and determined that spermatozoa were present. Robert W. Scanlon, a forensic scientist, determined, by using DNA tests, that the spermatozoa found on the washcloth stain were consistent with Russel Burket's DNA profile. Approximately 7.8% of the Caucasian population possess the same HLA DQa type as found in the examined stain.

Chelsea Brothers told Officer M.C. Stewart that "the bad man had a gun and a dog." Chelsea stated, while being transported to the ambulance for treatment of her injuries, that she was afraid of "the dog, the big dog. There is a dog out there." Chelsea added that the dog was "out there on the house, on the roof." Burket and his parents, who live next door to the Tafelski residence, had several large dogs in their backyard that frequently peered over a privacy fence surrounding their property. Numerous police personnel observed these dogs sitting on the roofs of their pens.

As several officers began to search the Tafelski residence for physical evidence, they noticed that a man, later identified as Burket, looked at them for several minutes before entering his residence. This occurred several times. On one occasion, Burket began to walk towards two of the police officers, and he was advised to return to his home.

Later that day, Detective K.P. Rexroad spoke with Burket in his home. During this discussion, Burket said that he was frequently in Mrs. Tafelski's home to perform odd jobs for the family whenever her husband was out of town. Burket stated that he was outside of his residence around midnight on January 13, 1993, but that he had not seen anything unusual.

### III.

### THE CONFESSION

### A.

On January 20, 1993, Detectives Shawn Hoffman and Robert Sager went to Burket's home about 2:00 p.m. Hoffman and Sager did not go to Burket's home to arrest him, but to interview Burket there or ask if he would accompany them to police headquarters for an interview. Detective Hoffman advised Burket and his mother, Ardyth Burket, that he would like Russel Burket to accompany Hoffman to the police headquarters to help with the investigation. Russel Burket stated that he "didn't have a problem with that." Hoffman advised Burket and his mother that Russel

Burket was not under arrest and that he was "certainly free to leave at any time."

Burket rode with Detective Hoffman and another detective to the police station in an unmarked police car. He was neither handcuffed nor restrained. There was no type of shield in the car. On the way to the police station, Hoffman and Burket stopped at a convenience store. The officers testified that they would have offered Burket a ride home had he changed his mind about participating in the interview.

The detectives and Burket arrived at the police headquarters about 2:30 p.m., and they went to an interview room. Hoffman closed the door to the interview room and informed Burket that he had done so to ensure their privacy. The detectives did not want the noise in the adjacent offices to interfere with the interview. Burket was not restrained or handcuffed in any way. The closed door was not locked. Hoffman advised Burket again that he was not under arrest and that he was free to leave at any time.

The interview commenced about 2:40 p.m. A video-audio tape was made of the interview. At 3:20 p.m., the detectives falsely informed Burket that the children inside the Tafelski home had seen him in the house on the night of the murders. Burket denied that he was in the house at any time on that night. At 3:22 p.m., the officers created another ruse by telling Burket that hair samples similar to his hair were found in the victims' residence. Then, Burket admitted that he had been in the victims' residence on the day of the murders.

At 3:24 p.m., Burket stated, "I'm gonna need a lawyer."[2] The detectives immediately advised Burket that he was not under arrest and that he was free to leave at any time if he so desired. Burket continued to talk with the detectives, stating that on the night of the murders, he had entered the residence when he noticed the rear door had been broken. He stated that he walked in, observed the victims, and immediately left the house. Later, Burket said that he had lost control of his emotions and had accidentally killed the victims.

Burket stated at 3:36 p.m., "I think I need a lawyer." The detectives frisked Burket, placed him in custody, and Detective

---

[2] Burket and the Commonwealth incorrectly state in certain portions of their respective briefs that Burket stated at 3:24 p.m., "I might need a lawyer." This error is also found in a transcript of the confession, which is a part of the record. Our review of the videotape of the confession reveals that Burket actually stated, "I'm gonna need a lawyer."

Sager advised Burket of his *Miranda* rights. Burket stated that he understood his *Miranda* rights at that time.

Detective Hoffman reentered the interview room and began to elicit from Burket biographical data necessary for "booking" purposes. Burket initiated several questions to Detective Hoffman, which did not relate to personal information. Detective Hoffman once again informed Burket of his *Miranda* rights. Burket stated that he understood his rights, and he wanted to talk with Detective Hoffman. Burket continued to talk with the detectives, and he ultimately gave a detailed confession of the murders of Kathy and Ashley Tafelski and the assaults upon Andrew J. Tafelski, Jr., and Chelsea Brothers.

The trial court denied Burket's motion to suppress the confession, finding that: Burket was not in custody until the police officers asked him to stand and frisked him, therefore, his *Miranda* rights did not attach until that time; Burket understood his *Miranda* rights that the detective read to him and he was willing to talk with the police and the detectives were placed in a position of asking further questions because of Burket's persistence; and that Burket knowingly, intelligently, and voluntarily waived his constitutional privilege against self-incrimination and his right to counsel.

### B.

Burket argues that he was in custody when he stated, "I'm gonna need a lawyer," and he should have been advised of his *Miranda* rights at that time. Thus, Burket contends that his confession, which was made later in the interrogation, is inadmissible. We disagree.

In *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the Supreme Court held that an individual must be warned before any questioning by police of his right to remain silent and his right to an attorney only when that "individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Id.* at 478. Explaining that *Miranda* warnings are implicated only during a custodial interrogation, the Supreme Court observed in *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977):

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact

that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

And, as the Supreme Court has repeatedly held, "[i]t is the custodial nature rather than the location of the interrogation that triggers the necessity for giving *Miranda* warnings." *Beckwith* v. *United States*, 425 U.S. 341, 346 (1976); *accord, Coleman* v. *Commonwealth*, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983), *cert. denied*, 465 U.S. 1109 (1984) ("[T]he giving of *Miranda* warnings is not required in every case where a suspect is interrogated at police offices.").

 ▇ The Supreme Court has stated the applicable principles we must apply when determining whether an individual is in custody.

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*California* v. *Beheler*, 463 U.S. 1121, 1125 (1983).

 ▇ Applying these principles here, we hold that Burket was not in custody until the police officers searched him and placed him under arrest. Our review of the videotape of the interrogation reveals that the following exchange occurred immediately after Burket said, "I'm gonna need a lawyer.":

DETECTIVE HOFFMAN: Listen, son. Listen to me.

RUSSEL BURKET: That's all I saw is what happened and I got out of there like you said.

DETECTIVE HOFFMAN: Do you understand that you are not under arrest?

RUSSEL BURKET: Yes.

DETECTIVE HOFFMAN: Do you understand that?

RUSSEL BURKET: Yes.

DETECTIVE HOFFMAN: Okay. All right. Do you understand that you are free to leave and everything?

RUSSEL BURKET: Yes.

DETECTIVE HOFFMAN: I haven't placed you under arrest. Right?

RUSSEL BURKET: Yeah.

Burket was neither formally arrested nor deprived of his freedom of movement until after he stated later during the interview that the murder "was an accident." Accordingly, we hold that the detectives were not required to advise Burket of his *Miranda* rights when he stated, "I'm gonna need a lawyer."

## C.

During the interrogation, Burket told the detectives that he accidentally killed the victims. Immediately thereafter, the following colloquy occurred:

Q Russel, you've got to help us now.

A Yes.

DETECTIVE SAGER: You've got to help us now.

RUSSEL BURKET: I think I need a lawyer.

DETECTIVE HOFFMAN: Okay. I'm going to let you sit here then. Okay. Do you have anything on you, Russel?

[After a short conversation that was limited to Burket's description of items in his possession and his request for ciga-

rettes, the detectives left the room. When Detective Sager returned, the following colloquy occurred.]

DETECTIVE SAGER: Obviously you watch television as you have mentioned. You know what we've got to do now.

RUSSEL BURKET: Read me my rights.

DETECTIVE SAGER: Pardon —

RUSSEL BURKET: Read me my rights.

DETECTIVE SAGER: Oh, yeah. Right. Shawn and I are trying to do everything we can to show you that we are not mad at you. You know, we are not trying to do anything to you. But —

RUSSEL BURKET: Like I said before you didn't read me my rights. Right?

DETECTIVE SAGER: No. We didn't.

Q You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand?

A What was the question again.

Q If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand that?

A Yes.

Q You can decide at any time to exercise these rights and not answer any questions or make any statements. Okay. You told us that you didn't want to talk to us any more. That's fine. We are not going to ask you anything else. But we also told you we wouldn't play games with you, wouldn't bull shit you. We would be level with you. So, we just want to let you know what's going on. We will not attempt to keep you in the dark. In fact Shawn and I have been working all

day and all night for six days. Just so you will understand what is going on. Lester is in the room next door. We've got him. And two other guys in the squad are talking to him. We have four people executing the search warrant at your house. And when I say your house, I mean the house, the truck, the garage, the buildings out back. Every single place. The search warrant that we have basically enables them to dismantle the house if necessary to find what we are looking for. That's what we are doing right now. As well as doing a search at Andy's, RK Chevrolet, and Andy's locker or tool box and that kind of stuff. So, right now we are no longer asking you anything. If you have any questions that you want to ask me or Shawn, feel free.

Burket argues that he invoked his right to counsel when he stated during the interrogation, "I think I need a lawyer." He asserts that the detectives were required to cease their interrogation and that the trial court erred by holding that he failed to invoke his right to counsel.

Burket's argument simply has no merit. As the above-referenced portion of the interrogation reveals, Burket was frisked and read his *Miranda* rights after he stated, "I think I need a lawyer." We find nothing in the record that suggests Burket's *Miranda* rights were violated.

Burket also argues that the detectives violated his *Miranda* rights by continuing to converse with him after he had been advised of his *Miranda* rights. We disagree.

■ As we have previously observed, after Burket had been placed under arrest, Detective Hoffman returned to the interview room to elicit some personal information from Burket in order to fill out a "booking form." Burket initiated a conversation with Hoffman. Hoffman reminded Burket of his *Miranda* rights and read those rights to Burket again. After Detective Hoffman read Burket his *Miranda* rights, Burket chose to converse with the officers further. As the trial court observed:

It appears to the court from viewing the transcript that Detective Sager properly gave all the rights to the defendant. It does not appear that any response was made by the defendant; but the court is of the opinion that whatever response the defendant made is basically irrelevant because his

response was treated by the police officers as though he had invoked his *Miranda* rights because, as is demonstrated from the evidence from the tape when Detective Hoffman came back into the room, he was almost scrupulous in his efforts to make clear to the defendant that he was trying to get only personal information, that he did not want to continue a discussion of the facts of this case with the defendant; and it was only after the defendant persisted in wanting to ask questions that Detective Hoffman re-advised the defendant of his constitutional rights to which the tape is very clear the defendant indicated upon each question that he understood the question and that he was willing to talk to the detective.

The court, therefore, very clearly finds that the defendant was read his rights, that he understood his rights and that he was willing to talk to the police officer.

### D.

During the interrogation, and after the detectives had read Burket his *Miranda* rights twice, the following exchange occurred:

Q Okay. Do you remember having —

A I don't think that I should say anything. I mean —

Q Hey, let's wait a minute. Wait a minute. Okay? It's up to you. Listen, I'm not going to pressure you. I'm asking you what you saw. I'm not going to yell and scream at you.

A I just don't think that I should say anything because —

Q That's up to you. I mean, hey, listen, that's up to you, son. I'm not going to pressure you. Okay? You were asking me some things and I said, okay, let's talk. I'm not trying to drill you into the ground. You're in trouble. Remember, you're in trouble. The severity of the trouble probably depends on you. I can make it anything that I want it to be. Do you understand that?

A Okay. I have a problem —

. . . .

Q Rusty, you know. It's not a question that I'm playing games in here, Rusty. You know. Kathy and Ashley were not alive when you left the house, were they? But Chelsea and A. J. were, weren't they?

A (Russel Burket nodded his head in the negative.)

Q They were, weren't they?

A I'm not going to say any more because I don't know that. I need somebody that I can talk to.

Burket argues that the detective should have stopped the interrogation because his statements, "I just don't think that I should say anything" and "I need somebody that I can talk to" indicated that he desired to cease the interrogation. We disagree.

As the trial court found, Burket did not refuse to answer the questions and he never asked that the interview be stopped. As referenced above, Detective Hoffman informed Burket that it was his decision whether to continue the interrogation. Burket elected to continue.

Burket, relying upon *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975), asserts that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" We are of opinion that Burket's reliance upon *Michigan* v. *Mosley* is misplaced because he never invoked his right to remain silent or his right to terminate questioning. It is true that his statements can be perceived as a reservation about the wisdom of continuing the interrogation. However, in spite of whatever reservations he may have had, he elected to proceed with the interrogation and failed to exercise his right to terminate questioning. *Lamb* v. *Commonwealth*, 217 Va. 307, 311-12, 227 S.E.2d 737, 741 (1976); *Akers* v. *Commonwealth*, 216 Va. 40, 45-46, 216 S.E.2d 28, 31-32 (1975). Furthermore, as the trial court found, Burket was persistent in his efforts to discuss the facts relating to the crime with Detective Hoffman, and Hoffman readvised Burket of his *Miranda* rights before continuing the interrogation.

### E.

Burket argues that the trial court erred in finding that his waiver of his *Miranda* rights was voluntary, knowing, and intelligent. We disagree.

 We have repeatedly stated and applied the well-established standard of review that is applicable here:

> "A defendant's waiver of his *Miranda* rights is valid only if the waiver is made knowingly, voluntarily and intelligently. *Miranda*, 384 U.S. at 475. Whether a statement is voluntary is ultimately a legal rather than factual question. *See Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450 (1985). Subsidiary factual questions, however, are entitled to a presumption of correctness. *Id.* at 112, 106 S.Ct. at 451. The test to be applied in determining voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.' *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 225 (1973). In determining whether a defendant's will has been overborne, courts look to 'the totality of all the surrounding circumstances,' *id.* at 226, including the defendant's background and experience and the conduct of the police, *Correll* v. *Commonwealth*, 232 Va. 454, 464, 352 S.E.2d 352, 357 (1987); *Stockton*, 227 Va. at 140, 314 S.E.2d at 381."

*Mueller* v. *Commonwealth*, 244 Va. 386, 394, 422 S.E.2d 380, 386 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1880 (1993) (quoting *Gray* v. *Commonwealth*, 233 Va. 313, 324, 356 S.E.2d 157, 163, *cert. denied*, 484 U.S. 873 (1987)).

 The trial court's determination that Burket's waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently is supported by substantial and credible evidence. The record shows that Burket, even though dyslexic, was tested and his test scores were in the low range of average intelligence. The trial court found:

> This defendant's [Burket's] demeanor was that of an alert, composed, even knowledgeable individual. There was nothing unusual about his behavior. He appeared to understand all

the questions posed by the police officer. He responded appropriately. He never appeared confused or frightened. In fact as was commented on, it also struck me that the defendant's verbal ability was quite impressive — as I might add was his general knowledge of things legal. Two examples — he was the one who raised with Detective Sager that it was time for the rights. There was a statement somewhere in the transcript in which the defendant made a very knowledgeable statement about not trying to construct an alibi. Throughout this defendant appeared to be unintimidated, responsive; and in fact at times he actually negotiated with the police officers during the course of this interview. He never asked that the interview be stopped.

Based upon our review of the record, we conclude that the factual findings of the trial court are supported by the record and, therefore, we accord them substantial weight in making our determination whether Burket's statement was voluntary. *See Miller* v. *Fenton*, 474 U.S. 104, 112 (1985), *cert. denied sub nom. Miller* v. *Neubert*, 479 U.S. 989 (1986). Based on the trial court's findings and our independent review of the record, we hold, as a matter of law, that Burket's waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently.

## IV.

### ISSUE PREVIOUSLY DECIDED

Burket argues that the imposition of the death penalty violates the Eighth Amendment's prohibition of cruel and unusual punishment and violates his due process rights under the Fourteenth Amendment. This issue has been decided adversely to him by our previous decisions. We adhere to those decisions and, accordingly, we will not discuss them further. *Breard* v. *Commonwealth*, 248 Va. 68, 75, 445 S.E.2d 670, 675 (1994); *Quesinberry* v. *Commonwealth*, 241 Va. 364, 370-71, 402 S.E.2d 218, 222-23, *cert. denied*, 502 U.S. 834 (1991).

## V.

### PROCEDURAL BAR

In spite of pleading guilty to all charges, Burket argues that his "constitutional right to a jury trial was denied to him

because this Court had ruled that he could not tell the jury how much time appellant would serve if given a life sentence." We do not consider this argument because it is not the subject of an assignment of error and, thus, may not be considered on appeal. Rule 5:17. Furthermore, Burket did not raise this issue in the trial court. Rule 5:25.

## VI.

### PENALTY PHASE

#### A.

During the penalty phase of the proceedings, several expert witnesses testified about Burket's mental condition. Thomas V. Ryan, a clinical psychologist with a specialty in neuropsychology, testified on behalf of Burket. Ryan assessed Burket's intellectual abilities "in a low average to average range." Ryan testified that Burket's academic abilities such as reading, writing, and arithmetic are significantly impaired.

Gary Lee Hawk, a clinical psychologist, also testified on behalf of Burket. He opined that Burket has a severe form of dyslexia, and that he suffers from dysthymia, which is a form of persistent mild to moderate depression.

Burket had received medical treatment in the past. He had tried to commit suicide on two occasions. However, Hawk opined that Burket is not mentally retarded, and there is absolutely no evidence of mental retardation in the record.

Paul Mansheim, a physician specializing in psychiatry, was directed by the trial court in accordance with Code § 19.2-264.3:1(F) to ascertain the "existence or absence of mitigating circumstances relating to the defendant's mental condition at the time of the offense." Dr. Mansheim interviewed the defendant, reviewed his medical records and other pertinent data, and opined, in his report and at trial, that the only factor that mitigated against the imposition of the death penalty is that Burket had not committed any prior crimes. Dr. Mansheim disagreed with those parts of the opinions of Hawk and Ryan that considered the defendant's mental condition as a mitigating factor.

Other testimony adduced during the sentencing phase revealed that even though Burket had been deemed disabled for purposes of eligibility for social security benefits, he is capable of being employed, as evidenced by his past employment as a bagger at two

separate grocery stores and as a construction worker. He did not formally graduate from high school, but he had received a certificate of attendance, and he had a driver's license. He is capable of performing automotive repairs, and he is a member of a hunt club.

## B.

At the conclusion of the sentencing hearing, the trial court considered the factors in mitigation. The trial court stated:

> Even if I accept the testimony of Doctor Hawk — and I have to say that I believe his conclusions were seriously undermined by the evidence in this case and by his own admissions and certainly by the testimony of Doctor Mansheim, who I found to be a more credible witness; but even if I am to accept the testimony of Doctor Hawk, the defendant's so-called mental problems consist of mild to moderate depression. Doctor Hawk found no evidence of a serious mental disorder. In other words, although [defense counsel] has skillfully attempted to make a case, the facts simply don't support that case and the mitigating factors are not present.

Burket argues that the trial court erred in finding that the Commonwealth's expert witness, Dr. Mansheim, was more credible than his expert witnesses, Ryan and Hawk. Burket says, in support of this contention, that Mansheim found only one fact in Burket's background that would mitigate against the imposition of the death penalty, and Mansheim was "less than truthful in his report and his testimony."[3]

We disagree with Burket's contentions. The trial court, as the finder of fact, is entitled to weigh the evidence, to observe the

---

[3] Burket claims that Dr. Mansheim was "less than truthful" because Dr. Mansheim stated in his report and on direct examination that he had reviewed certain documents before meeting with Burket to evaluate him. During one portion of his cross-examination, Dr. Mansheim testified that he had not reviewed seven of nine documents mentioned in his report before he interviewed Burket. Later, during the cross-examination, however, Dr. Mansheim stated, "It's true that I had all the nine things when I prepared the report, and it's true all the nine things went into my opinions. It just doesn't happen to be true I had all the nine things at the exact time I saw Mr. Burket." The trial court implicitly accepted Dr. Mansheim's explanation and, thereby, rejected Burket's claim that Dr. Mansheim was less than truthful. We cannot, on this record, conclude that the trial court's finding is erroneous as a matter of law.

demeanor of the witnesses, and to assess their credibility. This is exactly what the trial court did here, and there is an abundance of evidence to support the trial court's factual findings.

## C.

We also reject Burket's argument that the trial court "erred in not finding mitigating factors which would weigh against imposing the death penalty." Burket, seeking to buttress his contention, says that the trial court failed to consider fully his prior mental history, the testimony of former neighbors that they were not afraid of him, and his relationship with members of a hunt club of which he was a member.

We find no merit in Burket's contentions. During the hearing to fix punishment, the trial court stated:

It is the court's responsibility, the court's duty in cases of this nature, however, to take into consideration all evidence which may be produced in mitigation of these offenses. The penalty is not to be lightly imposed.

I believe I have considered all the mitigating factors that have been raised. I believe that they have all gone into the equation. Among them are such things as the fact that the defendant has pled guilty to these offenses, his age, his lack of a prior record, his family background, his school record, his work record, his physical condition, and the comments of his friends who testified over the past couple of days.

The primary emphasis, of course, has been on the defendant's mental condition; and for quite a number of hours, [defense counsel] has done an excellent job trying to portray to this court a person, a defendant, who has serious mental problems. I listened closely to all the witnesses. I particularly listened closely to the experts, and I read all the reports more than once. It's obvious — or certain points are obvious. The defendant is not insane, he's not mentally retarded, and he's not mentally or emotionally disturbed.

Our review of the record convinces us that the trial court did consider all the evidence in mitigation. As we recently observed:

While this evidence was mitigating in that it showed "extenuating circumstances tending to explain, but not excuse, his commission of the crime," *Coppola* v. *Commonwealth*, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), *cert. denied*, 444 U.S. 1103 (1980), it did not require as a matter of law that the death penalty not be imposed in this case. It was the fact finder's duty to consider this evidence with the other evidence in determining the appropriate sentence. The fact finder was not required to give controlling effect to the mitigating evidence.

*Murphy* v. *Commonwealth*, 246 Va. 136, 142, 431 S.E.2d 48, 52, *cert. denied*, 510 U.S. ____, 114 S.Ct. 336 (1993) (quoting *Correll* v. *Commonwealth*, 232 Va. 454, 468-69, 352 S.E.2d 352, 360, *cert. denied*, 482 U.S. 931 (1987)).

### D.

█ Burket argues Andrew J. Tafelski, Sr., the husband of Katherine Tafelski and the father of Ashley and Andrew Tafelski, Jr., should not have been allowed to testify during the penalty proceeding because, purportedly, his testimony was tantamount to a victim impact statement. We do not consider this argument because our review of the record reveals that Burket did not make a proper objection in the trial court. Rule 5:25.

### VII.

### SENTENCE REVIEW

Code § 17-110.1(C)(2) requires this Court to review the imposition of the death sentence on Burket, based on the trial record, to determine whether (i) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or (ii) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

█ We observe that Burket does not contend that the death penalty was imposed under the influence of any of the above statutory factors, nor does he contend that the sentence is excessive or disproportionate to the penalty imposed in similar cases. Nevertheless, we have examined the records of all capital cases reviewed by this Court, pursuant to Code § 17-110.1(E), giving

particular attention to those cases where the death penalty was based upon the "future dangerousness" and the "vileness" predicates. These cases are collected in *Breard*, 248 Va. at 89, 445 S.E.2d at 682.

Upon review of these records, as well as cases in which life imprisonment was imposed, we hold that Burket's sentence of death is neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in Virginia for crimes of a similar nature. Furthermore, based upon our review of the record, we find nothing that suggests that Burket's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## VIII.

## CONCLUSION

We find no reversible error in the issues presented here. Having reviewed the imposition of Burket's sentence of death pursuant to Code § 17-110.1, we hold that the sentence of death should be affirmed. Accordingly, we will affirm the judgment.

*Affirmed.*