COURT OF APPEALS OF VIRGINIA


Present:  Judges Willis, Bray and Humphreys
Argued at Richmond, Virginia


JAMES EDGAR TALBERT, III

                                    MEMORANDUM OPINION* BY
v.    Record No. 2145-01-2         JUDGE JERE M. H. WILLIS, JR.
                                         JULY 9, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Robert W. Duling, Judge

            Matthew P. Geary for appellant.

            Eugene Murphy, Assistant Attorney General
            (Jerry W. Kilgore, Attorney General, on
            brief), for appellee.


     James Edgar Talbert, III, was convicted in a bench trial of

second-degree murder, in violation of Code § 18.2-32; use of a

firearm during the commission of a murder, in violation of Code

§ 18.2-53.1; and possession of a firearm by a convicted felon, in

violation of Code § 18.2-308.2.  On appeal, he contends that the

trial court erred (1) in partially denying his motion to suppress

evidence; (2) in convicting him of second-degree murder; (3) in

convicting him of using a firearm during the commission of murder;

and (4) in convicting him of possession of a firearm by a

convicted felon.  We affirm the judgment of the trial court.

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## I.  BACKGROUND

### A.  THE SHOOTING

On May 10, 2000, Talbert went to Derrell Farrow's apartment to pick up some mail.  Knowing the neighborhood to be a high-crime area frequented by drug dealers and having been robbed twice in that area, he placed a handgun in his back pocket.  Talbert was a previously-convicted felon.

Arriving at Farrow's apartment, Talbert collected his mail and began looking at some photos that Farrow had taken.  While he was looking at the photos, Farrow made sexual advances toward him, attempting to fondle his genital area.  Talbert told Farrow to stop.  Farrow then asked to perform oral sex on him.  Talbert refused and pulled the handgun out of his back pocket.

Struggling for the weapon, the two men fell onto a sofa.  The handgun discharged, and Farrow suffered a fatal gunshot wound to the chest.  Talbert fled the apartment and drove to Shana Harvey's apartment on North 35th Street.  Before entering her apartment, he discarded the handgun.

From Harvey's apartment, Talbert contacted the Richmond Police Department and reported that he had witnessed Farrow's shooting.  He offered to provide information.  Soon thereafter, Detectives Joyce Payne and Lloyd Redford arrived at Harvey's apartment.

-

## B.  POLICE INVESTIGATION AND INTERVIEW

When the detectives arrived, they asked Talbert what had happened.  According to Detective Redford:

> [Talbert] told me that he had been to visit
> a friend.  While he was in there, he was in
> the back bedroom, he heard a knock at the
> door, two gentlemen came in, and he heard
> one of them tell the victim, give it up.
> Another one appeared in the doorway of the
> back bedroom, scuffled with him, one of them
> tried to take the ring off his finger, and
> he got away and ran out the door.

Talbert told the detectives that while fleeing, he heard a gunshot.  He then jumped into his truck and drove away.

Detective Redford went to Farrow's apartment and then returned to Harvey's apartment.  The detectives asked Talbert and Harvey to accompany them to the police station to put their statements on tape.  Detective Payne told Talbert that he did not have to go to the station.  Detective Payne said, "this is totally on your own, if you would like to come down."  Talbert and Harvey agreed to go and rode with the detectives to the police station.

At the police station, Harvey was interviewed first.  During her interview, which lasted twenty to thirty minutes, Talbert waited outside the interview room, where he was watched by a uniformed officer.  Talbert's interview began at approximately 5:00 a.m.  The detectives asked him initially whether he minded talking with them.  He replied, "ok."

-

The interview room was small and was equipped with a round table and four chairs. Talbert sat at the table. Initially, the door was closed. Detectives Payne and Redford and Sergeant Walker questioned Talbert for approximately an hour and a half to two hours. At various times Talbert was questioned by one, two, or all three officers and the door was open. At no time was he told he was not free to leave.

While questioning Talbert, the police began to doubt his story because of inconsistencies between his account and the physical evidence. Talbert said four men struggled in the apartment, but the damage was inconsistent with that claim. Talbert also said he ran out the apartment's back door, but there were no fingerprints on the back door. Approximately halfway through the interview, Detective Payne began considering whether Talbert should be a suspect.

The officers told Talbert repeatedly that what he was saying did not match the evidence and that he needed to be truthful. About an hour into the interview, Detective Redford decided Talbert was holding back something, but he didn't know what.

After Talbert was told that the evidence suggested that only he and Farrow had been in the apartment and that a gunshot residue test would show that he fired the gun, he recanted his story. He explained that the gun had discharged accidentally

-

when he and Farrow were "scrambling" over it.  The following

colloquy ensued:

> Talbert:  We got to talking when I got
> there.
>
>  *      *      *      *      *      *      *
>
> Talbert:  Didn't want to[;] it wasn't
> supposed to happen.
>
> Redford:  I'm sure it wasn't.  What
> happened?
>
> Talbert:  It accidentally went off.
>
> Redford:  The gun accidentally went off?
> Won't nobody in there other than the two of
> y'all right?
>
> Talbert:  Yeah.  We won't gone be no
> shooting, that ain't supposed to happen.  We
> was scrambling and he just squeezed my hand
> and it went off.

At that point Talbert had not been advised of his <u>Miranda</u>

rights.[1]

Talbert was then handcuffed.  A gunshot residue test was

performed and questioning continued.  Talbert told the police

that he had left the handgun at an abandoned house on North 35th

Street, near his girlfriend's apartment.

The police took Talbert and Harvey back to North 35th

Street.  Their purpose was to take Harvey home and to locate the

handgun.  As they were waiting for a key to the abandoned house

where Talbert said he had left the handgun, Harvey pointed to

Patrick Henley, who was walking down the street, and said he had

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

the handgun.  Without being asked, Talbert confirmed this.

Henley fled and threw the handgun in a storm drain, from which

it was recovered.  The police searched the abandoned house, but

found no weapon.  Forensic tests identified the handgun

discarded by Henley as the weapon that killed Farrow.

## C.  TRIAL

On Talbert's pretrial motion, the trial court suppressed

his statements following the portion recited above.  However, it

refused to suppress and received into evidence the recited

portion of his statements and the handgun.  It ruled that the

handgun had been found as a result of Harvey's statement, not as

a result of Talbert's statement to police.

Talbert waived his right to a jury trial, testified, and

was convicted of second-degree murder, in violation of Code

§ 18.2-32; use of a firearm during the commission of murder, in

violation of Code § 18.2-53.1; and possession of a firearm by a

convicted felon, in violation of Code § 18.2-308.2.

## II.  MOTION TO SUPPRESS CONFESSION

"In reviewing a trial court's denial of a motion to

suppress, 'the burden is upon [the defendant] to show that the

ruling, when the evidence is considered most favorably to the

Commonwealth, constituted reversible error.'"  McGee v.

Commonwealth, 25 Va. App. 193, 197 487 S.E.2d 259, 261 (1997)

(en banc) (citation omitted).  Talbert contends that his Fifth

Amendment rights were violated when the police questioned him

-

without informing him of his <u>Miranda</u> rights and that the trial court erred in partially denying his motion to suppress all of his statements to the police and the handgun.

"[T]he protection afforded by <u>Miranda</u> applies only when a suspect is subjected to custodial interrogation."  <u>Webber v. Commonwealth</u>, 26 Va. App. 549, 557, 496 S.E.2d 83, 86 (1998). In determining whether a person is in custody for <u>Miranda</u> purposes, we inquire "how a reasonable man in the suspect's position would have understood the situation."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).  Whether a person is in custody "depends on objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998).

In <u>Burket v. Commonwealth</u>, 248 Va. 596, 450 S.E.2d 124 (1994), Burket was asked by police to accompany them to police headquarters to assist with a double murder investigation. While still at his residence, he was told that he was not under arrest and that he was free to leave at any time.  Forty minutes into his interview at police headquarters, he was told falsely that some children had seen him at the murder scene on the night of the murders.  He was also told that hair samples similar to his were found at the victim's residence.

-

Burket then admitted he was at the scene.  He then said, "I'm gonna need a lawyer."  The investigator told him that he was not under arrest and that he was free to leave.  Burket then stated that he had accidentally killed the victims.  Again he stated he thought he needed a lawyer.  At that juncture, he was arrested and advised of his Miranda rights for the first time. Id. at 602-604, 450 S.E.2d at 128-29.

The Supreme Court held that Burket was not in custody until his arrest.  It highlighted the portion of his interview where the officers advised him that he was not under arrest.  It concluded:

> Burket was neither formally arrested nor
> deprived of his freedom of movement until
> after he stated later during the interview
> that the murder "was an accident."
> Accordingly, we hold that the detectives
> were not required to advise Burket of his
> Miranda rights when he stated, "I'm gonna
> need a lawyer."

Id. at 606, 450 S.E.2d at 130.

In Harris v. Commonwealth, 27 Va. App. 554, 500 S.E.2d 257 (1998), we held that Harris was not in custody despite the presence of three police officers, one of whom had pointed his gun at Harris for twenty minutes, during which time Harris was not free to turn around or leave.

Harris was a passenger in a car that was stopped for speeding and improper lane changes.  During the stop, a Virginia State Trooper asked and received consent from Harris for a

-

pat-down search of his clothing.  The search disclosed a

pipe-like device.   The trooper then questioned Harris, asking

him whether he used the pipe to smoke crack.  Harris replied

that he did not smoke crack.  The trooper then asked where his

tobacco was located.  Harris replied that it was in the car and

showed a tobacco pouch to the trooper.  Looking into the pouch,

the trooper discovered a vial of crack cocaine.  He then

arrested Harris and advised him of his <u>Miranda</u> rights.

In concluding that Harris was not in custody until he was

arrested, we said:

> [a]mong the circumstances to be considered
> when making a determination of whether a
> suspect was "in custody" are (1) the manner
> in which the individual is summoned by the
> police, (2) the familiarity or neutrality of
> the surroundings, (3) the number of officers
> present, (4) the degree of physical
> restraint, (5) the duration and character of
> the interrogation, and (6) the extent to
> which the officers' beliefs concerning the
> potential culpability of the individual
> being questioned were manifested to the
> individual.  No single factor is dispositive
> of the issue.

<u>Id.</u> at 565, 500 S.E.2d at 262.  We continued:

> We conclude that [Harris] was not entitled
> to <u>Miranda</u> warnings prior to the questioning
> by Trooper Watts that led to the discovery
> of the cocaine.  At the time of Trooper
> Watts' questioning, appellant's detention
> had been transformed from one whose purpose
> was to protect officer safety and maintain
> the status quo during a traffic stop to a
> Terry stop whose purpose was to investigate

-

> the appellant for suspected drug-related
> criminal activity.

Id. at 567, 500 S.E.2d at 263.

As in Burket and Harris, Talbert was not in custody for Miranda purposes until he admitted shooting Farrow and was handcuffed. Until that time, his Fifth Amendment rights were not violated. Although the police doubted his story, "[t]he fact that the investigation had focused upon [Talbert] and had become accusatory is not determinative of the question of custody." Smith v. Commonwealth, 219 Va. 455, 470, 248 S.E.2d 135, 142 (1978). Talbert remained at the police station voluntarily. He was not told that he could not leave. At times, the door to the interview room was open. He was not restrained. Only when he admitted shooting Farrow and was arrested and handcuffed did his presence cease to be voluntary. Until that time, no reasonable person in his situation would have believed that he was not free to leave.

Furthermore, Talbert waived his Fifth Amendment rights when he took the witness stand at trial. He admitted taking the handgun to Farrow's apartment. He admitted presenting the handgun to rebuff Farrow's sexual advances. He acknowledged that Farrow was shot during the ensuing struggle. He testified to everything that was included in the unsuppressed portion of his statement to the police, including the location of the firearm.

-

### III. <u>MOTION TO SUPPRESS THE FIREARM</u>

Talbert next contends that the trial court erred in refusing to suppress the handgun, which he argues was obtained as a result of unlawful questioning. We disagree.

At the time the handgun was recovered, the police had returned Talbert and Harvey to North 35th Street. Talbert contends that the police officers were going to the location where he had told them the handgun was hidden. However, viewed in the light most favorable to the trial court's ruling, the evidence disclosed that the police were then taking Harvey home. At that time, she saw Henley walking down the street and told the officers that he had the handgun. The handgun was then recovered.

In recovering the gun, the police relied on Harvey's statement, not on the statements made by Talbert during his questioning. Thus, the trial court did not err in admitting the gun into evidence. <u>See</u> <u>Murray v. United States</u>, 487 U.S. 533, 542 (1988).

### IV. <u>SUFFICIENCY OF THE EVIDENCE</u>

The fact that Talbert carried the handgun to Farrow's apartment and produced it as a show of force supports a finding of malice. Consequently, all the evidence, including Talbert's own testimony, supports his conviction for second-degree murder, from which flow his convictions for possession of a firearm by a

-

convicted felon and use of a firearm during the commission of murder.

The judgment of the trial court is affirmed.

<u>Affirmed.</u>