COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Baker and Bray
Argued at Norfolk, Virginia


LARRY DONNELL GREEN
                                                  OPINION BY
v.          Record No. 0581-97-1        JUDGE JOSEPH E. BAKER
                                                 JUNE 30, 1998
COMMONWEALTH OF VIRGINIA

           FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                     Verbena M. Askew, Judge

           Timothy S. Fisher (G. Ben Pavek, III;
           Overman, Cowardin & Martin, P.L.C., on
           brief), for appellant.

           H. Elizabeth Shaffer, Assistant Attorney
           General (Richard Cullen, Attorney General, on
           brief), for appellee.


     Larry Donnell Green (appellant) appeals from his bench trial

convictions by the Circuit Court of the City of Newport News

(trial court) for attempted rape, attempted robbery, inanimate

object sexual penetration, capital murder, and two counts of

first degree murder of three women.  Appellant entered

conditional pleas of guilty to all charges.  Appellant contends

the trial court erroneously failed to suppress inculpatory

statements he made to the police during the investigative stages

preceding his trial.  Finding no error, we affirm the judgments.

     Renee Wilkes was found dead in her home on December 15,

1994, as a result of smothering.  On December 19, 1994,

Detective L. L. Sheppard Mirandized appellant, and appellant made

a voluntary, non-inculpatory statement, which was videotaped.

     Eva Gray, appellant's aunt, was found dead in her home on

January 9, 1996, as a result of manual strangulation.  On January 16, 1996, Detective Sheppard asked appellant when he last saw Gray.  Appellant indicated he had last seen his aunt the previous August, "that he didn't know anything about her death and that he wasn't going to answer any more questions."  Sheppard asked no further questions at that time.

Helen "Kathy" Mewborn was found dead in her home on February 5, 1996, as a result of mechanical asphyxia.  Detective Sheppard again contacted appellant, who admitted he had been at Mewborn's home a few days earlier and agreed to go to the police station to make a statement.

On February 21, 1996, an attempted murder warrant was issued for appellant's arrest as a result of the complaint of Dorothy Graham that appellant had tried to strangle her the previous night.  Detectives Sheppard and Brown found appellant at about 3:30 p.m. and drove him to police headquarters, where they served him with the arrest warrant and orally advised him of his rights.  Appellant said "he didn't know anything about this incident and he wasn't going to say anything else unless he had an attorney."

Sheppard then said, "Since you don't want to talk, we will just take you over to the magistrate" to have the attempted murder warrant served.  Appellant responded, "Attempted murder? . . . 'She assaulted me.  I ought to take out a warrant for her assaulting me.'"  Appellant showed Sheppard some scratches on his chest.  Sheppard then said:

Mr. Green, I gave you this opportunity about

five minutes ago.  You said you didn't know
anything about it, that you wanted an
attorney.  Then [appellant said], 'Attempted
murder?  You're talking about my life.'  I
said, I understand that, but we gave you that
opportunity to talk to us about it and you
didn't wish to.

Appellant said he wanted to tell Sheppard what happened.
Sheppard "again . . . told [appellant] that he requested an
attorney and [that Sheppard] didn't want to talk to him again
[but] . . . [appellant] insisted that he wanted to talk . . . ."
Sheppard told appellant he was going to re-advise him of his
rights and have him put on tape that he requested an attorney and
now was initiating this conversation to give a statement in
reference to the incident involving Graham.  After Sheppard did
these things, appellant made a non-inculpatory statement about
the incident with Graham, and Sheppard turned off the tape
recorder at about 4:00 p.m.

      Due to the proximity of the Graham incident to the Gray
murder scene and the similarities of the Graham incident to all
three murders, Sheppard attempted to question appellant about
those murders.  Sheppard testified as follows:

[Appellant] was silent.  He wasn't real
vocal.  He told me that I had already spoke
[sic] with him before about Rene[e] Wilkes
and that he didn't have anything more to say
than what he had told me prior, and if I
didn't recall what [appellant] had told me,
then to go back and review the tape that I
had gotten from him on December the 19th of
1994.

On further questioning, appellant denied any involvement in the

- 3 -

murders of Gray and Mewborn, but admitted he had a cocaine

problem.  Sheppard testified as follows:

> And then [appellant] stated that if I thought that he wanted to confess to some things that he didn't do, that I might as well buckle up for the long ride[, and] . . . he turned his chair away from me. . . .  He turned all the way away from me and put his foot on the wall and leaned back in his chair and just closed his eyes.
>
> . . . . I continued to ask [appellant] about those three murders. . . .  I talked to him for about two and a half hours, and [appellant] didn't respond.  Several times I had to just ask him was he listening . . . to make sure that [appellant] wasn't asleep or anything.

Sheppard did not tape that session and made no notes because

appellant said nothing of substance.

At about 6:30 p.m., Sheppard left the interview room and

told Detective Brown that appellant was not saying anything.

Brown went into the interview room, came out fifteen to twenty

minutes later and told Sheppard that appellant wanted to talk to

him.  Sheppard went back into the interview room and, when he

asked appellant about Gray, appellant admitted he had last seen

her "when it was snowing" rather than in August, as he previously

had stated.  Sheppard said the cocaine appellant was using

probably caused him to lose control and that appellant should

think about who might die next.  Appellant began to cry and asked

to call his mother.  Sheppard left the room and returned about

twenty minutes later.  He "continued to ask [appellant] about the

murders."  Appellant was silent but he was responsive and was

looking at Sheppard. Sheppard, tired and believing that appellant had said all he was going to say for the time being, terminated the interview.

As Sheppard prepared to take appellant across the street to the jail, appellant started sobbing. When Sheppard asked what was wrong, appellant said he needed to talk and agreed to go back to the interview room with Sheppard. Appellant again asked to call his mother. After appellant finished the conversation with his mother, Sheppard asked appellant if he was ready to talk. Sheppard testified appellant responded as follows:

> [Appellant] said yes, he's going to tell me what happened. At that time I told [appellant] . . . I felt it was appropriate for me to re-advise him of his rights. Once again [appellant] acknowledged that I had already advised him of his rights, that he understood his rights, but I told him that I still felt that it would be appropriate.
> At that time I proceeded to advise [appellant] of his rights once again, and he told me he understood his rights. When . . . I began to question him about the three murders once more, . . . [appellant] [held] up his hand and [was silent] . . . .

Sheppard then asked appellant if he committed each of the three murders. Appellant said he did and described the details of each one. Sheppard asked appellant if he would make a tape recorded statement, and appellant said he would. However, when Sheppard returned with a tape recorder, appellant said he had had enough and did not want to talk anymore.

Appellant moved to suppress his confession[1] as violative of

_____

[1]The charge of attempted murder of Dorothy Graham was not

his Fifth Amendment right to silence.[2]  The trial court denied the motion and subsequently issued a letter opinion and order to that effect.  The trial court noted from the bench that appellant's actions were ambiguous at best, that appellant reinitiated the interrogation, and that it appeared appellant did so "more [because of] . . . his discussion with his mother than anything."

Appellant concedes he was fully <u>Mirandized</u> and waived his right to remain silent in order to make a statement about the Graham incident.  However, appellant argues that, after the Graham interrogation was complete, Sheppard attempted to question him about the three murders, despite appellant's clear indication that he did not want to answer further questions.  That assertion is premised on the following statements and conduct:  appellant's statement to Sheppard that appellant "didn't have anything more to say" about victim Wilkes and appellant's statement that if Sheppard wanted appellant "to confess to some things that he didn't do," Sheppard "might as well buckle up for the long ride," accompanied by appellant's turning his chair away, putting his foot on the wall, leaning back in his chair, and closing his

---

tried in these proceedings, and, therefore, appellant's motion to suppress did not apply to his statement concerning that incident.

[2]An accused also may refuse to answer questions by asserting his right to counsel under the Sixth Amendment.  <u>See, e.g.</u>, <u>Arizona v. Roberson</u>, 486 U.S. 675 (1988).  Because appellant has not alleged a Sixth Amendment violation, we review this appeal solely in terms of appellant's Fifth Amendment rights.

eyes.

On appeal from a denial of a motion to suppress, the burden is upon the defendant to show the trial judge's ruling, when the evidence is viewed most favorably to the Commonwealth, constituted reversible error. See Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1989). Here, appellant has not met his burden.

For a confession given during custodial interrogation to be admissible, the Commonwealth must show that the accused was apprised of his right to remain silent and that he knowingly, intelligently, and voluntarily waived that right. See Riddick v. Commonwealth, 22 Va. App. 136, 145, 468 S.E.2d 135, 139 (1996). Where a person is Mirandized and gives a knowing and intelligent waiver of his right to remain silent, "such waiver will be presumed to continue in effect throughout subsequent custodial interrogations until the suspect manifests, in some way which would be apparent to a reasonable person, his desire to revoke it." Washington v. Commonwealth, 228 Va. 535, 548-49, 323 S.E.2d 577, 586 (1984). Although the issue of voluntariness is a question of law subject to the court's independent review of the entire record, "the trial court's subsidiary factual findings, upon which voluntariness is determined, . . . will not be disturbed on appeal unless plainly wrong." Shell v. Commonwealth, 11 Va. App. 247, 252, 397 S.E.2d 673, 676 (1990).

The Virginia Supreme Court has declared that a clear and

unambiguous assertion of the right to remain silent or to counsel is necessary before authorities are required to discontinue an interrogation.  See Midkiff v. Commonwealth, 250 Va. 262, 266, 267, 462 S.E.2d 112, 115 (1995); Mueller v. Commonwealth, 244 Va. 386, 396-97, 422 S.E.2d 380, 387 (1992).  Expressions such as, "Do you think I need an attorney?", id. at 396, 422 S.E.2d at 387; "Do I have to talk about it now?", Akers v. Commonwealth, 216 Va. 40, 45-46, 216 S.E.2d 28, 31-32 (1975); "I don't got to answer that," and "I'm scared to say anything without talking to a lawyer," Midkiff, 250 Va. at 267-68, 462 S.E.2d at 115-16; "I don't think that I should say anything," Burket v. Commonwealth, 248 Va. 596, 609-10, 450 S.E.2d 124, 131-32 (1994); and "Maybe I should talk to a lawyer," Davis v. United States, 512 U.S. 452, 462 (1994), all have been held not to be clear and unambiguous invocations of the right to silence or to counsel.

Here, it is equally obvious that appellant's words and acts did not constitute a clear and unambiguous invocation of his right to silence.  The record clearly discloses that appellant was informed of his Miranda rights and knowingly, intelligently, and voluntarily waived his right to silence and made a statement about the Graham attempted murder charge.  When appellant initially invoked his right to silence, Sheppard scrupulously honored that invocation.  When appellant started to talk after asserting that right, Sheppard reminded him that he had invoked his right to remain silent, and further questioning occurred only

- 8 -

after appellant voluntarily expressed his desire to make further statements. Indeed, appellant does not challenge the voluntariness of his statements regarding the Graham attempted murder charge; he concedes that these statements were voluntary and were made after a waiver of his earlier invocation of his rights to counsel and silence.

Appellant contends his subsequent statements and actions constituted a second invocation of his right to silence. Under the principles set out above, we disagree. First, appellant's statement that he "didn't have anything more to say" about the murder of Wilkes was not a clear and unambiguous invocation of his right to silence. See, e.g., Midkiff, 250 Va. at 267-68, 462 S.E.2d at 115-16; see also United States v. Banks, 78 F.3d 1190, 1197 (7th Cir. 1996) (holding that defendant did not invoke right to remain silent with the statement, "I don't got nothing to say"), cert. denied, 117 S. Ct. 486 (1996).

Similarly, appellant's statement to the effect that he would not confess to something he did not do and that Sheppard should "buckle up for the long ride" did not constitute a clear and unambiguous assertion of the right to silence, even where accompanied by appellant's turning his chair away, closing his eyes and remaining silent for two-and-one-half hours. See Midkiff, 250 Va. at 268, 462 S.E.2d at 116 (noting that "[n]othing within [the appellant's] statement connotes a desire to cease all questioning"); see also State v. Perkins, 364 N.W.2d

20, 23-24 (Neb. 1985) (holding that actions of accused in leaning chair against wall, closing eyes and crossing arms for half an hour of approximately one-and-one-half-hour interrogation did not constitute invocation of right to silence following earlier waiver).  Moreover, subsequent to those acts and before appellant confessed to the crimes, Sheppard again advised appellant of his right to remain silent and to have an attorney present. Appellant acknowledged that he was aware of those rights and voluntarily confessed to the crimes.

We cannot say the trial court was plainly wrong; accordingly, the judgments of the trial court are affirmed.

<u>Affirmed.</u>