COURT OF APPEALS OF VIRGINIA


Present:   Judges Beales, Alston and Senior Judge Annunziata
Argued at Alexandria, Virginia


ALEXANDER R. MERVIN-FRAZIER

                                                        MEMORANDUM OPINION* BY
v.        Record No. 2114-08-4                          JUDGE ROSSIE D. ALSTON, JR.
                                                              APRIL 6, 2010
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                                    Lisa B. Kemler, Judge

                Megan Thomas (Emily Beckman, Assistant Public Defender; Office
                of the Public Defender, on brief), for appellant.

                Jennifer C. Williamson, Assistant Attorney General (William C.
                Mims, Attorney General, on brief), for appellee.


        Alexander Mervin-Frazier (appellant) appeals from his convictions of non-forcible

sodomy, in violation of Code § 18.2-361(A), and consensual intercourse with a child fifteen

years or older, in violation of Code § 18.2-371(ii).  On appeal, appellant contends (1) the trial

court erred in denying appellant's motion to suppress statements that appellant made after

exhibiting signs of medical distress; (2) the trial court erred in denying appellant's motion to

suppress statements that appellant alleges were obtained after he invoked his right to remain

silent; and (3) the evidence was insufficient to sustain appellant's convictions for non-forcible

sodomy and consensual intercourse with a minor.  For the reasons that follow, we affirm in part,

reverse in part, and remand the case for a new trial if the Commonwealth be so advised.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND[1]

On February 21, 2008, appellant was arrested on a warrant for non-forcible sodomy, on the ground that he carnally knew F.M., the seventeen-year-old daughter of his girlfriend. At the time of his arrest, appellant was living with F.M. and F.M.'s mother. Later, appellant was also charged with having sexual intercourse with F.M.

After the arrest, Detective Maxwell transported appellant to the police station. At approximately 6:45 p.m., Detective Maxwell orally advised appellant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), by reading from a pre-printed form. Appellant told the detective that he understood his rights and that he had been arrested on more than one occasion, at which time the police informed him of his rights. Appellant stated that he had not consumed any alcohol or drugs that day, that he could read and write English, and that he had taken some college courses. Appellant then reviewed the pre-printed form and signed it at the bottom, indicating that he wished to waive his rights and make a statement to the police.

Throughout the interrogation, Detective Maxwell told appellant that F.M. claimed he raped her, and Detective Maxwell encouraged appellant to admit he had consensual sex with F.M. Detective Maxwell repeatedly reminded appellant how serious a rape allegation was, and stated that it was not illegal to have consensual sex. At the outset of the interrogation, appellant denied having any sexual contact with F.M. He also denied having an argument with F.M. the previous day. Then, at approximately 7:15 p.m., Detective Maxwell told appellant that she had recorded a telephone conversation between appellant and F.M. that occurred on February 21, 2008, prior to his arrest. In the recorded conversation, appellant discussed an argument he had with F.M. on February 20, 2008, and acknowledged that he had torn his t-shirt during a "temper

---

[1] As the parties are fully conversant with the record in this case, and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings that are necessary to the parties' understanding of this appeal.

tantrum" related to their argument. Detective Maxwell asserted that appellant's and F.M.'s argument referenced their sexual relationship. Shortly thereafter, appellant began to act oddly and sweat profusely. Appellant indicated that he was having a medical emergency, and Detective Maxwell summoned emergency medical personnel. In an effort to assist appellant, Detective Maxwell helped appellant lie down on the floor and propped his feet up on a chair. While waiting for the paramedics, appellant continued to speak to Detective Maxwell. He said that he thought he was experiencing an anxiety attack. He also attempted to discuss the offenses; however, Detective Maxwell informed appellant that further discussion of the allegations could wait until after appellant's condition improved.

Approximately ten minutes later, the paramedics arrived. They checked appellant's vital signs and asked him a number of questions, including inquiries into his medical history and drug and alcohol use. Appellant said he had felt claustrophobic and had suffered an anxiety attack. The paramedics offered to take appellant to the hospital. He refused the offer and insisted he felt better. Before the paramedics left, Detective Maxwell asked them if appellant's vital signs were "regular." When the paramedics responded in the affirmative, Detective Maxwell asked appellant if he wished to continue speaking with her. He insisted he did. After stressing to appellant that she did not want to put appellant's health at undue risk, Detective Maxwell agreed to resume the interview at approximately 7:30 p.m. She did not re-inform appellant of his Miranda rights.

Detective Maxwell and appellant again discussed appellant's argument with F.M. and his "temper tantrum." Detective Maxwell then asked appellant if he shaved his pubic area. When appellant answered in the affirmative, Detective Maxwell told appellant that F.M. averred that appellant showed F.M. his pubic area on February 20, 2008, and that F.M. saw that his pubic area was hairless. Appellant denied showing F.M. his pubic area, but he did admit to having an

argument with F.M. and ripping his shirt because he was upset.  Appellant was not sure how

F.M. was familiar with the appearance of his pubic area, but he conjectured that she may have

heard appellant discussing it with F.M.'s mother.

 After further discussion, appellant stated, "I don't think I want to even talk any more

now."  Detective Maxwell replied, "Okay[,] you don't have to talk any more."  She then left the

room.  One to two minutes later, Detective Maxwell returned to clarify whether appellant wanted

to continue the interview.  She referred appellant to the waiver form he signed and reminded him

of his right to remain silent.  Again, she asked whether he wanted to continue speaking to her.

Appellant replied, "If I stop talking to you because you're talking me in circles and I keep going

back to this and you're saying you're not worried about that.  It's just confusing me. . . .  So

that's why I'm deciding now to stop talking."  Detective Maxwell responded, "Okay.  That's no

problem.  If you change your mind, let me know."

 Detective Maxwell reiterated that if appellant wished to add anything to his testimony, he

should inform her.  She then began asking appellant questions from a "History Sheet."  At trial,

Detective Maxwell testified the History Sheet contained background questions, which covered a

broad range of topics, including, but not limited to, the suspect's physical characteristics, his

hobbies, and his current and past employment.  Detective Maxwell testified that there were many

different theories regarding the purpose of the History Sheet, but that she "usually use[d] it for

getting as much information as possible in case the person absconds."

 Detective Maxwell first asked appellant for his social security number, his middle name,

and his height.  When she asked appellant how much he weighed, he responded that he had lost

fifteen pounds in the last three weeks.  Detective Maxwell then asked appellant why he lost so

much weight.  Later, Detective Maxwell asked appellant about the dates he worked for previous

employers, and she inquired why appellant left his previous position.  He told her that his former

boss made sexual advances toward him. Detective Maxwell then asked appellant about his employment at the Madera Hotel, which is where he was employed when he met F.M.'s mother. Appellant told Detective Maxwell that all the information could be found on his web page, and in response, Detective Maxwell asked appellant how she could get to his web page.

Additionally, Detective Maxwell asked appellant if he had any hobbies. He told her that he liked to read, and she continued to question him about what kinds of books he enjoyed. When appellant told Detective Maxwell that he liked self-help books, she asked him what he "need[ed] self-help for?" In the course of asking appellant about his criminal record, Detective Maxwell asked whether F.M.'s mother was the victim of his assault and battery charge. Detective Maxwell asked a number of other questions, including where she could reach appellant's mother. At some point during the questioning, appellant asked the detective, "What is all of this information for?" She responded, "It's just some dummy form I fill out. I have to fill it out."

After she completed the form, Detective Maxwell told appellant that she was going to gather her belongings and transport appellant to jail. Because appellant appeared confused, Detective Maxwell reminded him he was under arrest for sexual assault. He replied, "This is real? . . . Oh my goodness man." Thereafter, appellant continued to talk to Detective Maxwell about the charges. Appellant repeatedly denied having any sexual contact with F.M. and suggested that F.M. and her mother were fabricating the allegations. Even though Detective Maxwell interrupted him several times and reminded him of his right to remain silent, appellant continued talking. At one point, appellant pointed out that earlier in the interview, Detective Maxwell had told appellant he could change his mind about stopping the discussion and choose to reinitiate his conversation with her.

After some time had passed, Detective Maxwell attempted to end the interview, saying she was frustrated that appellant would not admit to having sexual contact with F.M. Appellant

asked her to sit down at the table so that he could continue the conversation. About thirty minutes after Detective Maxwell said she was taking him to the jail, appellant admitted he had consensual oral and vaginal sex with F.M. and stated F.M. propositioned him and initiated the sexual contact. The entire interrogation of appellant was videotaped, and a DVD of the interrogation and a transcript of that recording were entered into evidence at the hearing on the motion to suppress.

In his motion to suppress, appellant argued that his confession was made involuntarily because his medical emergency critically impaired his capacity for self-determination. He further argued that it was obtained unconstitutionally after he invoked his right to remain silent. The trial court overruled appellant's motion. The trial court found that appellant's statements were made voluntarily and that appellant had recovered from his medical emergency when he made the statements. Additionally, the trial court found that appellant did not make a clear and unambiguous statement invoking his right to remain silent.

During the trial, the jury heard testimony by F.M., F.M.'s mother, and Detective Maxwell, among other witnesses. F.M. testified that she and appellant had oral sex and sexual intercourse on February 2, 2008. The DVD recording and the transcript of appellant's interrogation and confession were admitted into evidence over appellant's objection. The jury convicted appellant of non-forcible sodomy, in violation of Code § 18.2-361(A), and consensual intercourse with a child fifteen years or older, in violation of Code § 18.2-371(ii). This appeal followed.

## II. ANALYSIS

### A. Motions to Suppress

On appeal, appellant raises two separate constitutional challenges in the context of the trial court's denial of his motions to suppress. First, he contends the incriminating statements

that he made were involuntary, because Detective Maxwell continued to question him after his medical distress critically impaired his capacity for self-determination. Next, he maintains that his confession was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1996), because Detective Maxwell did not cease the interrogation when appellant invoked his right to remain silent.

"In reviewing a trial court's denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth as the party that prevailed below, and grant to its evidence 'all reasonable inferences deducible therefrom.'" Watts v. Commonwealth, 38 Va. App. 206, 213, 562 S.E.2d 699, 702 (2002) (quoting Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998)). This Court "review[s] the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case." Id. at 213, 562 S.E.2d at 703 (citing Ford v. Commonwealth, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998)); accord Ornelas v. United States, 517 U.S. 690, 700 (1996). The burden is upon appellant "to show the trial judge's ruling . . . constituted reversible error." Green v. Commonwealth, 27 Va. App. 646, 652, 500 S.E.2d 835, 838 (1998) (citing Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1989)).

### 1. Voluntariness of the Confession

"The Commonwealth has the burden to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given." Sellers v. Commonwealth, 41 Va. App. 268, 272, 584 S.E.2d 452, 455 (2003) (citing Wilson v. Commonwealth, 13 Va. App. 549, 554, 413 S.E.2d 655, 658 (1992)). Whether a confession is given voluntarily is a question of law, which the appellate court reviews *de novo*. Midkiff v. Commonwealth, 250 Va. 262,

268-69, 462 S.E.2d 112, 116 (1995) (citing Harrison v. Commonwealth, 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992)).

"In assessing voluntariness, the [C]ourt must determine whether the statement is the product of an essentially free and unconstrained choice by its maker, or . . . whether the maker's will has been overborne and his capacity for self-determination critically impaired." Roberts v. Commonwealth, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994) (internal quotations and internal citations omitted).  In order to make this independent determination, this Court must "look to the totality of all the surrounding circumstances." Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2d 722, 723 (1992).  This includes consideration of "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997) (citing Peterson, 15 Va. App. at 488, 424 S.E.2d at 723; Morris v. Commonwealth, 17 Va. App. 575, 579, 439 S.E.2d 867, 870 (1994)).  "The mental condition of the defendant is 'surely relevant to [his] susceptibility to police coercion'; however, evidence of coercive police activity 'is a necessary predicate to finding that a confession is not "voluntary."'" Peterson, 15 Va. App. at 488, 424 S.E.2d at 723 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  "The amount of coercion necessary to trigger the due process clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, but *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary." Id. (citing United States v. Haddon, 927 F.2d 942, 945 (7th Cir. 1991); McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).

Reviewing the circumstances surrounding the police interrogation as established by the evidence viewed in the light most favorable to the Commonwealth, we find that appellant's

- 8 -

statements made after the medical emergency, but prior to his invocation of his right to remain silent, were voluntarily given. When Detective Maxwell perceived that appellant might be in medical distress, she immediately terminated questioning, and summoned paramedics to care for appellant. While they waited, she attempted to alleviate appellant's discomfort and prevented him from discussing the allegations. Upon their arrival, the paramedics checked appellant's vital signs and inquired into possible causes for his discomfort. Appellant believed he had experienced a panic attack and claustrophobia and insisted that he felt better. He refused to accompany the paramedics to the hospital, and importantly, he told Detective Maxwell repeatedly that he wanted to continue speaking to her.

Nothing in the record indicates that appellant was experiencing continuing medical distress when he agreed to recommence the interrogation. In finding that appellant voluntarily confessed, the trial court specifically found that appellant appeared to have recovered prior to reinitiation of the interrogation. The trial court also noted that appellant was not on drugs, nor had he consumed alcohol. Furthermore, the trial court found that appellant was an intelligent person with a high school degree. Appellant had taken several college courses and could read and write. Appellant had also been read his rights several times, and had been arrested before. Finally, the trial court found that Detective Maxwell employed a variety of permissible tactics, and she did not threaten appellant or make any promises at the outset of the interrogation. The trial court determined that appellant continued to speak out of a genuine desire to continue the discussion. Moreover, the trial court heard the testimony of the witnesses and actually watched the DVD of the interrogation.

We cannot conclude that the trial court's findings were plainly wrong. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v.

Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citing Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985); Carter v. Commonwealth, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982)).  Appellant had physically recovered when the paramedics exited the interrogation, and he knowingly and intelligently decided to continue the interrogation.  We conclude the trial court's essential findings that the appellant's statement was the product of a free and unconstrained choice by the appellant and that appellant's will was not overborne when the detective continued the interrogation after appellant exhibited signs of medical distress do not constitute reversible error.  Thus, the trial court did not err in denying the motion to suppress in this regard.

## 2.  Invocation of the Right to Remain Silent

Appellant next contends that the trial court erred by admitting statements he made after invoking his right to remain silent.  We agree.

The Fifth Amendment protects individuals from self-incrimination resulting from "informal compulsion exerted by law-enforcement officers during in-custody questioning." Miranda, 384 U.S. at 461.  Thus, during all in-custody interrogations, police must adhere to procedural safeguards to ensure that an accused's rights are scrupulously honored.  The Supreme Court of the United States has acknowledged that an accused's right to end an interrogation is critical:

> Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation.  The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

Michigan v. Mosley, 423 U.S. 96, 103-04 (1975).

"For a confession given during custodial interrogation to be admissible, the Commonwealth must show that the accused was apprised of his right to remain silent and that he

knowingly, intelligently, and voluntarily waived that right." Green, 27 Va. App. at 652, 500

S.E.2d at 838 (citing Riddick v. Commonwealth, 22 Va. App. 136, 145, 468 S.E.2d 135, 139

(1996)). During the interrogation, "once the required warnings have been given . . . , the

interrogation must cease if the individual, 'at any time prior to or during questioning,' expresses

a desire to remain silent." Weeks v. Commonwealth, 248 Va. 460, 470, 450 S.E.2d 379, 386

(1994) (quoting Miranda, 384 U.S. at 474). When a clear and unambiguous assertion of the right

to remain silent is made, the police are required to discontinue the interrogation. Midkiff, 250

Va. at 266-67, 462 S.E.2d at 115. Notably, this jurisprudence instructs us that the test for

defining a defendant's implementation of his Fifth Amendment rights focuses on whether the

specific terms used by the defendant "connote[ ] a desire to cease all questioning." Id. at 268,

462 S.E.2d at 116. Accordingly, each case must be assessed from its own unique circumstances.

In the instant matter, during the interrogation, appellant said, "I don't think I want to even

talk any more now," and "So that's why I'm deciding now to stop talking." The Commonwealth

argues that these statements are comparable to those that have been ruled to be ambiguous, such

as "Do I have to talk about it now?," Akers v. Commonwealth, 216 Va. 40, 45-46, 216 S.E.2d

28, 31-32 (1975), "I just don't think I should say anything," Burket v. Commonwealth, 248 Va.

596, 609-10, 450 S.E.2d 124, 131-32 (1994), and "I don't have anything more to say," Green, 27

Va. App. at 652-54, 500 S.E.2d at 838-39.

In Akers, 216 Va. 40, 216 S.E.2d 28, our Supreme Court found that the question, "Do I

have to talk about it now?" was not a clear and unambiguous statement of the defendant's rights.

Id. at 45-46, 216 S.E.2d at 31-32. The Court's ruling is instructive in the instant case:

> We do not construe [the] defendant's response to
> mean that he did not want to answer any more questions.
> [The d]efendant's inquiry was no more than an impatient
> gesture on his part. If defendant had desired to end the
> interrogation, he could have simply said, "I do not want to

- 11 -

answer any more questions." See State v. Nichols, 212 Kan. 814, [816,] 512 P.2d 329, 332 (1973).

Id. at 46, 216 S.E.2d at 32. Similarly, our Supreme Court found that when the defendant in Burket, 248 Va. 596, 450 S.E.2d 124, said, "I just don't think I should say anything," the defendant did not invoke his right to remain silent or his right to terminate questioning. Id. at 610, 450 S.E.2d at 132. The Court instead found that appellant was expressing "a reservation about the wisdom of continuing the interrogation." Id.

In Green, the defendant had discussed with the officer a criminal act other than the crime at issue in the case. Green, 27 Va. App. at 648-49, 500 S.E.2d at 836. At the defendant's trial, the officer testified that when he attempted to discuss the crime that was the subject of the case with the defendant, the defendant told the officer "that he didn't have anything more to say." Id. at 649, 500 S.E.2d at 837. This Court held that defendant's statements were not a clear and unambiguous assertion of his right to remain silent. Id. at 653, 500 S.E.2d at 838. In making its ruling, the Court cited Midkiff, 250 Va. at 268, 462 S.E.2d at 116, for the proposition that the defendant's statement had to "connote[ ] a desire to cease all questioning" to effectively invoke the defendant's right to silence. Green, 27 Va. App. at 654, 500 S.E.2d at 839.

Here we do not find that appellant's statements were equivocal, such as those found in Akers, Burket, and Green. While appellant's statement, "I don't think I want to talk any more now," may be ambiguous, shortly thereafter, appellant told Detective Maxwell that she was "talking [him] in circles," which was confusing him. He then said, "So that's why I'm deciding now to stop talking." These last remarks were clearly an attempt to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Mosley, 423 U.S. at 103-04. Taken as a whole, appellant's statements were a clear and unambiguous assertion of his right to remain silent and connoted a desire to cease all questioning.

- 12 -

The Commonwealth contends that when appellant "expressed uncertainty" about continuing the interrogation, Detective Maxwell, "in an abundance of caution," ceased questioning appellant about the allegations and began asking him questions from the History Sheet for booking purposes. We disagree with the Commonwealth's contention, and the dissent's conclusion, that Detective Maxwell ceased the interrogation as required by Fifth Amendment jurisprudence.

Miranda dictates that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. Any further "statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." Id. at 474. "[This] privilege is asserted to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." Pennsylvania v. Muniz, 496 U.S. 582, 595 (1990) (citing Doe v. United States, 487 U.S. 201, 212-13 (1988)).

We respectfully disagree with the dissent's conclusion that Detective Maxwell ceased the interrogation when she began asking appellant questions from the History Sheet. The dissent suggests that because the History Sheet questions were not directly related to the charges against appellant, it was permissible for Detective Maxwell to pose them to appellant.[2] We believe that to allow the vast range of questions here, that the government claims were unrelated to the charges, is impermissible, because "[t]o limit the ambit of Miranda to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of Miranda.'" Rhode Island v. Innis, 446 U.S. 291, 299 n.3 (1980) (quoting Commonwealth v. Hamilton, 285 A.2d 172, 175 (Pa. 1971)). Thus,

---

[2] Based on the record, we find that the History Sheet questions do not fall under any other recognized exception to the requirements of Miranda.

under the circumstances presented by this case, we find that the Fifth Amendment barred any further questioning by Detective Maxwell, except for those questions permissible under the strict parameters of the booking exception.

The Commonwealth argues that even if appellant asserted his Miranda rights by invoking his right to remain silent, the line of questioning emanating from the History Sheet was permissible, because the questions were similar to routine booking questions, which fall under an exception to the protections of the Fifth Amendment.

"[T]here is a routine booking question exception in Virginia, 'which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services.'" Watts, 38 Va. App. at 215-16, 562 S.E.2d at 704 (quoting Muniz, 496 U.S. at 601). In Watts, this Court recognized that to ensure the effective functioning of the correctional system, it was necessary for police to obtain basic biographical information from individuals who are under arrest. Id. at 216, 562 S.E.2d at 704. The basic biographical information is relevant to a correctional facility's custodial duties and the individual's placement in inmate housing. See id. at 217-18, 562 S.E.2d at 705. The Supreme Court of the United States has held that while booking an individual, police may ask the individual for his name, address, height, weight, eye color, date of birth, and current age. Muniz, 496 U.S. at 601-02. "However, the routine booking questions exception 'does not mean . . . that any question asked during the booking process falls within that exception. . . . [T]he police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.'" Watts, 38 Va. App. at 216, 562 S.E.2d at 704 (quoting Muniz, 496 U.S. at 602 n.14). The test is "'whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.'" Id. at 217, 562 S.E.2d at 705 (quoting Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 238 (1998)).

Preliminarily, we note that Detective Maxwell was not asking appellant questions from the History Sheet to "secure the biographical data necessary to complete booking or pretrial services," as described by Watts, 38 Va. App. at 215-16, 562 S.E.2d at 704. Rather, Detective Maxwell described the History Sheet questions as a method for "getting as much information as possible in case the person absconds." While Detective Maxwell asked appellant some questions permissible under the booking question exception, many of the questions went beyond the acquisition of biographical data. She asked appellant about his hobbies, his prior employment, and his past relationships with women. None of these questions apply to the placement of an individual in the correctional system. See id. at 217-18, 562 S.E.2d at 705.

Furthermore, we disagree with the trial court's finding that the History Sheet questions "had nothing to do with the crime itself." It is apparent that an objective observer would have viewed a number of Detective Maxwell's questions "'as designed to elicit an incriminating response.'" See id. at 217, 562 S.E.2d at 705 (quoting Timbers, 28 Va. App. at 196, 503 S.E.2d at 238). Questions regarding appellant's place of employment, which is where he met F.M.'s mother, other women's romantic interest in him, and his need for self-help books have absolutely nothing to do with securing the biographical data necessary to complete booking or pretrial services for the appellant. Moreover, relying on the responses to these so-called booking questions, Detective Maxwell repeatedly told appellant that he was not at fault for having sex with F.M., considering F.M. was "throwing herself at [him]," as other women had done in the past. Contrary to the dissent's view, we do not find Detective Maxwell's questions to be innocuous. Rather, the questions did not strictly adhere to the well-defined parameters of the booking exception. Detective Maxwell's later questions reflected her knowledge of information gleaned through the History Sheet questions.

Because Detective Maxwell did not immediately cease questioning appellant when he invoked his right to remain silent, and because the History Sheet questions did not constitute permissible booking questions, all of his statements made after he invoked his Fifth Amendment rights were "the product of compulsion, subtle or otherwise." Miranda, 384 U.S. at 473-74. This violation of appellant's Fifth Amendment rights tainted any subsequent confession that appellant made while in police custody. Thus, the trial court erred in overruling the motion to suppress, and we reverse the trial court's judgment in this respect.

## B. Sufficiency of the Evidence[3]

"Notwithstanding the fact that we reverse for a Fourth Amendment violation, 'we address appellant's sufficiency of the evidence argument because the Commonwealth would be barred on double jeopardy grounds from retrying appellant if we were to reverse for insufficiency of the evidence.'" Hargraves v. Commonwealth, 37 Va. App. 299, 312, 557 S.E.2d 737, 743 (2002) (quoting Timbers v. Commonwealth, 28 Va. App. 187, 202, 503 S.E.2d 233, 240 (1998)); accord Parsons v. Commonwealth, 32 Va. App. 576, 581, 529 S.E.2d 810, 812 (2000) (citing Burks v. United States, 437 U.S. 1, 18 (1978)).

When considering the sufficiency of the evidence on appeal of a criminal conviction, "we review the evidence in the 'light most favorable' to the Commonwealth." Pryor v. Commonwealth, 48 Va. App. 1, 4, 628 S.E.2d 47, 48 (2006) (quoting Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" Cooper v. Commonwealth, 54 Va. App. 558, 562, 680 S.E.2d 361, 363 (2009) (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d

---

[3] As the Attorney General does not argue that the trial court's consideration of appellant's confession was harmless error, we will not consider this argument on appeal.

755, 759 (1980) (emphasis omitted)). "'The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it.'" Clark v. Commonwealth, 30 Va. App. 406, 410, 517 S.E.2d 260, 261 (1999) (quoting Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988)).

In determining whether the evidence was sufficient, "we consider all admitted evidence, including illegally admitted evidence." Hargraves, 37 Va. App. at 312-13, 557 S.E.2d at 743 (citing Lockhart v. Nelson, 488 U.S. 33, 41 (1988)).

> "If there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998). We accord the judgment of a trial court sitting without a jury the same weight as a jury verdict. See Clay v. Commonwealth, 30 Va. App. 254, 258, 516 S.E.2d 684, 685 (1999).

Id. at 313, 557 S.E.2d at 743.

Appellant maintains on appeal that the evidence presented at trial failed to establish that he committed non-forcible sodomy, in violation of Code § 18.2-361(A), and that he had consensual intercourse with F.M., a minor, in violation of Code § 18.2-371(ii). To establish a violation of Code § 18.2-361(A), the Commonwealth must show that appellant carnally knew F.M. "by or with the mouth, or voluntarily submitted to such carnal knowledge." Pursuant to Code § 18.2-371(ii), a person is guilty of consensual intercourse with a minor if he "engages in consensual sexual intercourse with a child 15 or older not his spouse, child, or grandchild."

Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to prove appellant committed both offenses. At trial, F.M. testified that she and appellant had sex multiple times during the period spanning the summer of 2007 to February 2, 2008. On February 2, 2008, she engaged in oral sex and sexual intercourse with appellant at his request. She agreed to engage in the sexual contact in exchange for appellant's permission to attend a school dance.

- 17 -

The February 2, 2008 sex acts are the offenses at issue in this case. It is uncontested that F.M. was seventeen years old at that time.

Further, F.M. testified that the day before she reported the sexual contact to the police, appellant attempted to engage in sexual intercourse with her. When she refused his request, he ripped his t-shirt in frustration. During this same interaction, appellant pulled down his pants and exposed his pubic area, which had been shaved. Physical evidence collected at the apartment shared by F.M., her mother, and appellant, appellant's statements during the recorded telephone conversation, and appellant's admissions to Detective Maxwell corroborated F.M.'s account of appellant's sexual contact with her.

Appellant argues that this Court must discount F.M.'s testimony because it is inherently incredible and so contrary to human experience to render it unworthy of belief. See Moyer v. Commonwealth, 33 Va. App. 8, 28, 531 S.E.2d 580, 590 (2000) (en banc) ("The conclusions of the fact finder on issues of witness credibility 'may only be disturbed on appeal if this Court finds that [the witness'] . . . testimony was inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" (quoting Robertson v. Commonwealth, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991))). To support his contention that F.M.'s testimony is inherently incredible, appellant argues that if he had engaged in sexual misconduct, F.M. would have reported the abuse to her mother, rather than let it continue for months. He also argues that F.M. repeatedly denied having sexual contact with appellant when asked by her mother, a counselor, and a teacher. Further, he argues that F.M. wrote in graphic detail in her journal about sexual encounters she experienced with her peers, but she never discussed in her journal any sexual interactions with appellant. We disagree with appellant, and find that nothing in F.M.'s testimony is so contrary to human experience or human behavior as to render it inherently incredible.

Finally, appellant argues that the veracity of his confession is called into question, because it occurred at the end of a three-hour interrogation, during which time appellant had experienced a medical emergency and attempted to end the interview. Moreover, appellant argues that the admission was preceded by an offer "to change his story" to avoid being charged with rape. These arguments are not persuasive, as we have already determined that appellant had recovered from his medical emergency at the time of his admission. Additionally, the evidence shows that when appellant couched his admission as a "story," Detective Maxwell stated that she was only interested in the truth and that she did not wish to talk to him unless he was telling the truth. Thereafter, appellant made his confession, which was consistent with F.M.'s allegations.

Therefore, the evidence was sufficient to prove that appellant engaged in non-forcible sodomy and sexual intercourse with F.M., a minor.

### III. CONCLUSION

For the reasons stated, we hold that the trial court did not err in denying appellant's motion to suppress on the ground that his will was overborne by the continuing interrogation after he displayed signs of medical distress. However, we hold the trial court erred in denying appellant's motion to suppress the statements he made to Detective Maxwell after the invocation of his right to remain silent. Finally, we hold that the evidence, including the illegally obtained evidence, was sufficient to prove appellant committed the charged offenses. We reverse appellant's convictions and remand the case for a new trial if the Commonwealth be so disposed.

Affirmed in part,
reversed in part,
and remanded.

Annunziata, J., concurring, in part, and dissenting, in part.

I concur in the majority's conclusion that the trial court did not err in denying appellant's motion to suppress on the ground that his will was overborne by the continuing interrogation after he displayed signs of medical distress. I also concur in the conclusion that the evidence was sufficient to support appellant's convictions. However, I respectfully dissent from the majority's finding that the trial court erred in admitting all of appellant's statements to the police after he unequivocally invoked his right to remain silent.

I agree with the majority that appellant unequivocally invoked his right to remain silent during custodial interrogation by the police. See Weeks v. Commonwealth, 248 Va. 460, 470, 450 S.E.2d 379, 386 (1994) (stating that when a defendant invokes his right to remain silent during custodial interrogation, the questioning must cease). In addition, I agree that, subsequent to appellant's invocation, portions of Detective Maxwell's conversation with him regarding the "History Sheet" exceeded the boundary permitted by the routine booking exception, "'which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services.'" Watts v. Commonwealth, 38 Va. App. 206, 215-16, 562 S.E.2d 699, 704 (2002) (quoting Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990)). As a result, the responses appellant made to Detective Maxwell's questions that were outside the parameters of the booking exception were inadmissible. However, I would find that, subsequent to appellant's discussion with Detective Maxwell regarding the History Sheet, appellant reinitiated discussion with the officer about the charged crimes and that ultimately appellant knowingly and intelligently waived his right to remain silent.

"[I]t is well settled that *even if invoked*, the Miranda right to silence can 'be waived by the suspect if the waiver is made knowingly and intelligently.'" Medley v. Commonwealth, 44 Va. App. 19, 35, 602 S.E.2d 411, 418 (2004) (*en banc*) (emphasis added) (quoting Jackson v.

- 20 -

Commonwealth, 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003)). After an accused invokes his right to remain silent, if he, "'not the police, [reopens] the dialogue with the authorities,' a court, upon consideration of that fact and 'the totality of the circumstances,' may reasonably find that the accused has made a 'knowing and intelligent' waiver of his rights." Harrison v. Commonwealth, 244 Va. 576, 583, 423 S.E.2d 160, 164 (1992) (quoting Edwards v. Arizona, 451 U.S. 477, 486 n.9 (1981)). In this context, "[t]he dialogue initiated by the accused must demonstrate 'a willingness and a desire for a generalized discussion about the investigation.'" Knox v. Commonwealth, 52 Va. App. 366, 376, 663 S.E.2d 525, 530 (2008) (quoting Oregon v. Bradshaw, 462 U.S. 1038, 1045 (1983)). Moreover,

> [t]he voluntariness of [a defendant's] ultimate waiver . . . "depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" [Michigan v.] Mosley, 423 U.S. [96,] 104 [(1975)]. "A statement procured in violation of Mosley is presumed to have been obtained by an involuntary waiver of Fifth Amendment rights and, therefore, it is inadmissible." Pugliese v. Commonwealth, 16 Va. App. 82, 88, 428 S.E.2d 16, 21 (1993).
>
> The question of "[w]hether a person's decision to remain silent has been 'scrupulously honored' requires an independent examination of the circumstances." Id. "This question is one of law subject to *de novo* review; however, the subsidiary factual findings of the [trial] court are entitled to a presumption of correctness." Correll [v. Thompson], 63 F.3d [1279,] 1290 [(4th Cir. 1995)].

Medley, 44 Va. App. at 37-38, 602 S.E.2d at 419.

Guided by these principles, this Court must independently examine the circumstances of this case and determine whether appellant ultimately waived his right to remain silent knowingly and intelligently. In so doing, "we view the evidence in the 'light most favorable to . . . the prevailing party below,' the Commonwealth in this instance . . . .'" Greene v. Commonwealth, 17 Va. App. 606, 608, 440 S.E.2d 138, 139 (1994) (quoting Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991)).

- 21 -

The record reflects that, after appellant's arrest, Detective Maxwell advised appellant of his Miranda rights using a preprinted form. Appellant initialed each of his rights on the form indicating he understood them. Appellant signed the waiver form to acknowledge he understood his rights, and was willing to waive them and make a statement to the police. Appellant indicated he had been arrested and advised of his Miranda rights more than once before.

In ensuing discussions with Detective Maxwell, appellant denied having sexual contact with the victim and, eventually, stated his desire to stop talking to Detective Maxwell. The officer clarified appellant's position on the issue, and ceased questioning him about the charges against him.

The officer then discussed the questions from the History Sheet with the appellant. During that conversation, Detective Maxwell did not engage in coercive tactics or pressure appellant to resume talking about the charges against him. Although Detective Maxwell asked appellant questions that did not relate to information necessary for processing him at the jail, the officer's inquiries were, for the most part, innocuous, focusing mainly upon appellant's family members, hobbies, interests, and former employment. Detective Maxwell's questions were not designed to elicit incriminating information from appellant, nor did appellant incriminate himself in response to the officer's inquiries.[4] As the trial court observed, the questions Detective Maxwell "followed up on had nothing to do with the crime itself." Indeed, as the trial judge stated, appellant proved himself "a chatty fellow" who "kept volunteering a lot of information."

When Detective Maxwell announced it was time to take appellant to jail, appellant exclaimed disbelief about his situation, and immediately resumed talking to the officer about the charges he faced. The officer repeatedly interrupted appellant, reminded him of his right to remain silent, and said she was not permitted to talk to him further. Despite Detective Maxwell's

---

[4] As Detective Maxwell testified, her purpose in completing the History Sheet was to obtain as much information as possible from appellant in case he absconded from the police.

interruptions, appellant persisted in talking about the victim's allegations. In fact, at one point appellant pointed out that Detective Maxwell had advised him earlier that he could change his mind about stopping the interview and could choose to reinitiate conversation with her.

Although Detective Maxwell did not again advise appellant of his Miranda rights at that juncture, it was clear from appellant's course of dealing with the police following his arrest for the offenses that he understood his right to remain silent but chose to waive that right and talk to the police about the charged offenses. Appellant's insistence upon talking to the officer in the face of the continued reminders that he could remain silent demonstrated his desire to discuss the charges with the police. See Knox, 52 Va. App. at 376, 663 S.E.2d at 530. There is no indication that Detective Maxwell's discussion with appellant regarding the History Sheet at all influenced his subsequent decision to resume discussion about the offenses. Detective Maxwell had not threatened appellant or made any attempt to persuade him to talk. Compare Commonwealth v. Ferguson, 278 Va. 118, 677 S.E.2d 45 (2009) (defendant did not voluntarily reinitiate conversation with the police where the officers threatened, cajoled, and subjected him to a coercive environment after he invoked his right to silence).

Based upon an independent review of the circumstances, I conclude that, following the completion of the History Sheet, appellant reinitiated discussion about the charges with Detective Maxwell and knowingly and intelligently waived his right to remain silent. See Mosley, 423 U.S. at 104. Therefore, I would affirm the trial court's denial of the motion to suppress the incriminatory statements appellant made after he reinitiated conversation with the police.