COURT OF APPEALS OF VIRGINIA


Present:   Judges Haley, Alston and Senior Judge Clements
Argued at Alexandria, Virginia


ARNOLD J. MANCIA MORALES

                                                MEMORANDUM OPINION* BY
v.        Record No. 2494-09-4                  JUDGE ROSSIE D. ALSTON, JR.
                                                     NOVEMBER 16, 2010
COMMONWEALTH OF VIRGINIA


                  FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                              Thomas D. Horne, Judge

            J. Daniel Griffith, Assistant Public Defender (Office of the Public
            Defender, on brief), for appellant.

            Josephine F. Whalen, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        Arnold J. Mancia Morales (appellant) appeals from his convictions for rape, in violation

of Code § 18.2-61, burglary while armed with a deadly weapon, in violation of Code § 18.2-89,

assault and battery, in violation of Code § 18.2-51, and abduction with the intent to defile, in

violation of Code § 18.2-48.  On appeal, appellant contends the trial court erred in denying his

motion to suppress statements he made to police officers.  Appellant argues these statements

were obtained in violation of his Fifth Amendment right to counsel.  Appellant further argues

that the trial court erred in convicting him of abduction with intent to defile, because the

asportation and detention of the victim within her home was incidental to the crime of rape.

Finally, appellant argues there was insufficient evidence to prove he was armed when he entered

the victim's home and, therefore, the trial court erred in finding there was sufficient evidence to

───────────────
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

support a conviction of burglary while armed with a deadly weapon. For the following reasons, we affirm the decision of the trial court.

## I. BACKGROUND[1]

On August 29, 2008, at approximately midnight, a loud crash woke the victim, a seventy-five-year-old woman. She exited her bedroom and entered the living area of the house. The victim lived in the residence alone. There, she encountered appellant who had "crashed into [the] sliding door" that separated the interior of her home from the screened-in porch. Although the victim was not wearing her glasses, she could see appellant come through the sliding door, walk toward her, and hold two fingers to her eyes and two fingers to her throat. Appellant forced the victim to walk with him to her bedroom, then back to the dining room, and finally back to her bedroom.

In the bedroom, appellant threw the victim down on the bed. He spoke in broken English and repeatedly expressed his desire for money or valuables. He repeatedly stated, "I slice you up if you don't give me any." The victim informed appellant that she had some cash in her wallet. Subsequently, appellant brandished a knife, which the victim had not seen before, and began cutting her arm and fingers. These injuries later required stitches.

After cutting the victim, appellant removed her underwear and raped her. At some point during this assault, appellant took off the victim's nightgown, tied it around her throat, and partially strangled her. After appellant completed the sexual assault, he dragged the victim from the bed, took her to the bathroom, and threw her in the bathtub. He turned the bathtub's water faucet on,

---

[1] As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

closed the curtain, and left the house. Appellant did not take any of the victim's valuables, including the $70 in the victim's purse.

After appellant left the house, the victim called the police. Police officers arrived at her residence a short time later. While securing the crime scene, officers discovered that a large stone had been removed from the yard of the residence and had apparently been used to shatter the sliding glass door that led from the screened-in porch into the home. The officers further noted that one of the porch's screens appeared to have been torn or cut. The officers did not recover a knife from the victim's residence.

The victim provided the police with a statement. She indicated that appellant twice attempted to have sexual relations with her. She stated that she did not think appellant was "able to perform" and did not think he ejaculated. The victim was then taken to the hospital where she was examined by a sexual assault nurse examiner (SANE) and treated for her injuries. In addition to the cuts on her arm and fingers, the victim had other cuts and bruises all over her body. She had a large bruise all the way around her neck and blood in her eye which resulted from appellant's attempt to strangle her with her own nightgown. At trial, the SANE testified that the victim had numerous acute injuries to her genitalia, which were consistent with blunt force trauma. The SANE further testified that the injuries to the victim's genitalia were consistent with penetration. Finally, the SANE testified that the victim's injuries were so severe that the examination took twice as long as examinations usually lasted.

Days later, one of the victim's neighbors found the victim's keys and a knife in his backyard. The police retrieved these items, but no fingerprints were recovered from the knife.

The authorities posted fliers throughout the community, requesting assistance with the investigation. Thereafter, the police began to focus on appellant as their primary suspect. They contacted his friends and family and sought public assistance in locating appellant.

Appellant turned himself in to the police department on September 14, 2008. The police handcuffed appellant and transported him to the headquarters of the Criminal Investigation Division. At the headquarters, Investigator J. Russ and Investigator C. Lesesne interrogated appellant. Appellant did not speak English well, so Lesesne translated Russ' questions; however, at several points during the interrogation, Lesesne independently conversed with appellant in Spanish. During these exchanges, Lesesne was not translating for Russ—she asked her own questions in Spanish and did not translate appellant's responses for Russ. This interrogation was recorded, and the DVD recording was played for the jury during appellant's trial.[2]

At the beginning of the interrogation, Lesesne advised appellant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Appellant told Lesesne that he understood his rights and agreed to waive them, but he refused to sign the acknowledgment form. The investigators then questioned appellant for approximately two hours. At the beginning of the interview, appellant admitted breaking into the victim's house. He claimed he used to live near the victim,

---

[2] We note that during appellant's motion to suppress the evidence, appellant provided the trial court with a copy of the transcript of the interrogation. Although the transcript was not entered into evidence and was only "substantively accurate," the trial court considered it and the testimony of the officers in its determination that appellant had not unambiguously invoked his right to counsel. The accuracy of the transcript was not challenged in any material respect, and neither party objected to the trial court's consideration of the transcript. As such, both parties have waived the opportunity to challenge the transcript's accuracy and the trial court's consideration of it pursuant to Rule 5A:18.

On appeal, the parties have presented varying accounts of Lesesne's translations of appellant's statements. As the trial court considered both the transcript of the DVD recording and the testimony of the officers, we will also consider this evidence on appeal. The quoted dialogue found in this opinion is quoted from the transcript of the DVD recording.

A review of the transcript and the DVD recording of the interrogation reveal that there were occasions where Lesesne and appellant spoke to each other in Spanish. While the Spanish conversations are included in the transcript, the conversations were not translated by Lesesne into English, and English translations of the Spanish conversations are not in the record. As this Court may only consider the facts that are contained in the record, we are not able to consider any untranslated portions of Lesesne's and appellant's Spanish conversation. See Smith v. Commonwealth, 16 Va. App. 630, 635, 432 S.E.2d 2, 6 (1993) ("An appellate court must dispose of the case upon the record . . . . We may only act upon facts contained in the record." (citing Riddick v. Commonwealth, 135 Va. 724, 726, 115 S.E. 523, 524 (1923))).

he thought the house was empty, and he only wanted money. He admitted that he gained access by breaking a big window with a rock and stated that the victim surprised him when she entered the living area. He told the investigators that he was carrying a knife when he entered the house and that he had obtained the knife from another house.

Appellant also said that he demanded money from the victim. When she said she didn't have any, appellant stated that he got nervous and hit the victim. He further admitted that he held the victim in one hand while holding the knife in the other hand. He stated that he then took the victim to the "back room" because he "supposed that's where her belongings would have been."

At this point in the interrogation, approximately forty-five minutes after beginning the interview, Russ asked appellant if he had thrown the victim on the bed. Appellant responded in Spanish, and Lesesne stated, "He says can I stop talking? Hold on . . . ." Lesesne then spoke to appellant in Spanish, and he responded in Spanish. Lesesne told Russ in English, "He says that if this is going to get him in trouble, if this is going to be against him . . . ." Lesesne then spoke to appellant in Spanish, and appellant responded in Spanish. Lesesne stated in English, "He says shall I talk to an attorney or what?" Russ responded, "I can't give you that kind of advice. We read you your rights." Lesesne translated Russ' response, and Russ continued, "I'm trying to get the truth[.] I'm trying to show that I don't think you meant for all this to happen and I think, I don't think you really wanted to hurt her. . . . I need the whole truth." Lesesne and appellant then had a brief conversation in Spanish. At the conclusion of the conversation, Lesesne reported that she asked appellant if he was embarrassed to talk in front of her because she was a woman and that appellant responded, "No." Appellant then spoke in Spanish, and Lesesne translated, "He wants to know if he tells you the truth, if you're gonna [sic] . . . if it's going to

- 5 -

get him into more trouble? . . . He says you already have [ ] everything . . . you have . . . ." Russ responded,

> Arnold, you're already in trouble[.] [Y]ou're already in trouble. Ok? If you te[ll] . . . going half way . . . half of the truth doesn't . . . to me show that you're sorry for what happened. You've got to make a decision whether or not you want to tell me the truth, so that I tell the Commonwealth [A]ttorney or anybody else that you told me the whole truth. I can't make you do that and I can't promise you anything. Other than I will tell those people that we talked and that you were sorry for what happened. But going part way . . . that doesn't show me you're sorry.

Lesesne translated these statements and, after further discussion with appellant in Spanish, said that appellant was willing to tell the "end of the story," since "he's already here."

The questioning then continued with no further mention of an attorney. Appellant claimed that the victim had told him to rape her, and he said that he placed the victim in the bathtub because "he got scared because of all the blood." Appellant denied attempting to strangle the victim and denied knowing how the victim's nightclothes came to be tied around the victim's neck. He admitted he took the victim's keys and said he threw the keys and the knife away.

At the conclusion of the interview, Russ obtained a buccal swab from appellant. Comparison of appellant's DNA with the vaginal swabs from the victim's post-assault medical examination revealed that appellant's DNA matched the DNA of the victim's assailant.

Appellant was arrested and charged with rape, burglary while armed with a deadly weapon, assault and battery, and abduction with the intent to defile. The trial court overruled appellant's motion to suppress his interrogation statements after he stated that he didn't want to answer any questions that would get him in trouble. In overruling the motion, the trial court found that appellant's "question was either if this [i.e., answering the detective's questions] is going to get me in trouble or if this is going to hurt me?" The trial court found that appellant

voiced a qualified request for an attorney, i.e., his desire for an attorney was dependent on whether the officers thought his answers would hurt him. The trial court also opined that appellant's question, "Shall I talk to an attorney or what?," was a request for advice rather than an invocation of his right to counsel.

In a jury trial, the trial court found appellant guilty of all of the charged offenses. This appeal followed.

## II. ANALYSIS

### A. The motion to suppress

Appellant contends on appeal that his statements regarding counsel, when considered in combination with the totality of the circumstances, constituted an unequivocal request for counsel sufficient to trigger the <u>Miranda</u> safeguards. Therefore, appellant argues that any statements he made after saying, "[s]hall I talk to an attorney or what?" must be suppressed.

"On appeal from a trial court's ruling on a motion to suppress, the appellant must show that the trial court's decision constituted reversible error." <u>Ferguson v. Commonwealth</u>, 52 Va. App. 324, 334, 663 S.E.2d 505, 509 (2008) (citing <u>Stanley v. Commonwealth</u>, 16 Va. App. 873, 874, 433 S.E.2d 512, 513 (1993)). "[W]e view the evidence in the light most favorable to the Commonwealth, the party prevailing below." <u>Aldridge v. Commonwealth</u>, 44 Va. App. 618, 638, 606 S.E.2d 539, 549 (2004) (citing <u>McCracken v. Commonwealth</u>, 39 Va. App. 254, 258, 572 S.E.2d 493, 495 (2002) (*en banc*); <u>Commonwealth v. Grimstead</u>, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991)). "In addition, we review the trial court's findings of historical fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case." <u>Watts v. Commonwealth</u>, 38 Va. App. 206, 213, 562 S.E.2d 699, 702-03 (2002) (citing <u>Ornelas v. United States</u>, 517 U.S. 690, 700 (1996); <u>Ford v. Commonwealth</u>, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998)).

During a custodial interrogation, the "assertion of the right to counsel is a significant event and . . . thereafter all questioning must be suspended until an attorney is present." Midkiff v. Commonwealth, 250 Va. 262, 265-66, 462 S.E.2d 112, 114 (1995) (citing Miranda, 384 U.S. at 474).

> The question whether a suspect actually invoked his right to counsel involves an objective inquiry. To invoke this right, a suspect must state his desire to have counsel present with sufficient clarity that a reasonable police officer under the circumstances would understand the statement to be a request for counsel. If, however, a suspect's reference to an attorney is either ambiguous or equivocal, such that a reasonable officer under the circumstances would only have understood that the suspect *might* be invoking his right to counsel, the officer is not required to stop questioning the suspect.

Commonwealth v. Hilliard, 270 Va. 42, 49, 613 S.E.2d 579, 584 (2005) (citations omitted). Moreover, when a suspect makes an ambiguous or equivocal statement, interviewing officers may ask questions to clarify whether or not the suspect actually wants an attorney; however, the officers are not required to do so. Davis v. United States, 512 U.S. 452, 461 (1994); Redmond v. Commonwealth, 264 Va. 321, 330, 568 S.E.2d 695, 700 (2002). In determining whether a suspect's reference to an attorney was ambiguous or equivocal, this Court must consider both the words he spoke and the context in which his statements were made. Hilliard, 270 Va. at 52, 613 S.E.2d at 586.

Here, Lesesne acted as an interpreter for appellant and issued the Miranda warnings to appellant in Spanish, his native language. Appellant told Lesesne that he understood his rights. Russ then conducted the interview, and Lesesne acted as an interpreter. Approximately forty-five minutes after the interview began, and after appellant admitted to Russ that he broke into the victim's home and forced her to walk with him to her bedroom, Russ asked appellant if appellant had thrown the victim down on her bed. Lesesne interpreted appellant's response as follows: "He says can I stop talking? Hold on [. . . .] He says if this is going to get him in

trouble, if this is going to be against him [. . . .] He says shall I talk to an attorney or what?" Russ responded, "I can't give you that kind of advice. We read you your rights." After this response by Russ, Lesesne and appellant then had a short conversation in Spanish. Lesesne reported to Russ that she had asked appellant if he was embarrassed to talk about what happened that night in front of her because she was a woman, and appellant said, "No." Appellant then provided incriminating details about the crime.

The trial court did not make any factual findings regarding the tone of appellant's voice, his inflections, or his demeanor. As such, our review is limited to the issue of whether appellant's words, as spoken, were legally sufficient to constitute an invocation of his right to counsel. Id. at 50, 613 S.E.2d at 585.

The facts in this case are similar to the facts in Hilliard, 270 Va. at 45-47, 613 S.E.2d at 581-83. In Hilliard, the defendant asked, "Can I have someone present too, I mean just for my safety, like a lawyer like y'all just said?" Id. at 46, 613 S.E.2d at 582. The investigating detective responded, "That's up to you." Id. Later in the interview, the Hilliard defendant said that he "would like to have somebody else in here because I may say something I don't even know what I am saying and it might . . . jam me up in some incidents, and I don't want that to happen, man." Id. The Supreme Court determined that the defendant's first statement was "merely an inquiry requesting a clarification or affirmation of the rights that had just been explained to him." Id. at 51, 613 S.E.2d at 585 (citing Eaton v. Commonwealth, 240 Va. 236, 253-54, 397 S.E.2d 385, 395-96 (1990); Poyner v. Commonwealth, 229 Va. 401, 410, 329 S.E.2d 815, 823 (1985)). The Supreme Court also held that the second statement was not an unequivocal request for counsel and that he was merely communicating "an uncertainty about the wisdom of continuing the interrogation without consulting another person." Id. at 52, 613 S.E.2d at 586 (citing Midkiff, 250 Va. at 267, 462 S.E.2d at 115; Burket v. Commonwealth, 248

- 9 -

Va. 596, 610, 450 S.E.2d 124, 132 (1994)). The defendant in Hilliard made a third request for an attorney, which the Supreme Court found to be unequivocal and unambiguous. Id. He asked, "Can I get a lawyer in here? [. . .] I already have a lawyer. I mean, I can talk to you, don't get me wrong. But I just want to make sure I don't, like I said before, just jam myself up." Id.

Appellant's statements regarding an attorney were similar to those statements of the Hilliard defendant that the Supreme Court found to be ambiguous and equivocal. Appellant's statements reflected uncertainty regarding his rights and whether or not he would be in trouble if he answered the officers' questions; however his statements were not an unequivocal request for an attorney. See id. at 51-52, 613 S.E.2d at 585-86; Midkiff, 250 Va. at 267, 462 S.E.2d at 115; Redmond, 264 Va. at 330, 568 S.E.2d at 700. Based on the record before us, we cannot conclude that appellant's statements were legally sufficient to invoke his right to counsel and that the trial court erred in denying appellant's motion to suppress the evidence obtained during the September 14, 2008 interview.

B. Abduction with the intent to defile

Appellant challenges the abduction with intent to defile conviction, contending the evidence was insufficient to prove his asportation and detention of the victim within her home was of more than slight extent and duration and, therefore, it was merely incidental to the crime of rape. We disagree.

Appellant was convicted of abduction with intent to defile in violation of Code § 18.2-48 and rape in violation of Code § 18.2-61. Code § 18.2-47(A) defines abduction generally and states in pertinent part, that "[a]ny person, who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction' . . . ." Code § 18.2-48(ii) in turn, provides a more severe punishment for abduction

- 10 -

"of any person with intent to defile such person."  See McKinley v. Commonwealth, 217 Va. 1, 4, 225 S.E.2d 352, 353 (1976) ("distinguishing feature" between offenses of abduction under Code § 18.2-47(A) (formerly Code § 18.1-36) and Code § 18.2-48 (formerly Code § 18.1-37) is defendant's specific intent); Fitzgerald v. Commonwealth, 223 Va. 615, 632, 292 S.E.2d 798, 808 (1982) (terms "defile" and "sexually molest" are interchangeable within meaning of Code § 18.2-48).

> "Whether an abduction is merely incidental to another crime is a question of law.  However, because no two crimes are exactly alike, determining whether an abduction is incidental necessarily requires consideration of the historical facts of each case."  Under this standard of review, "[w]e defer to the trial court's findings of historical fact, but we review *de novo* the trial court's application of those facts to the law."

Smith v. Commonwealth, 56 Va. App. 711, 721, 697 S.E.2d 14, 18-19 (2010) (internal citation omitted) (quoting Hoyt v. Commonwealth, 44 Va. App. 489, 496 n.4, 605 S.E.2d 755, 758 n.4 (2004)).

> A defendant may be convicted of abduction in addition to "another crime involving restraint of the victim, both growing out of a continuing course of conduct, . . . only when the detention [or asportation] committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime."

Bell v. Commonwealth, 22 Va. App. 93, 96, 468 S.E.2d 114, 115 (1996) (quoting Brown v. Commonwealth, 230 Va. 310, 314, 337 S.E.2d 711, 713-14 (1985)).

> Under this principle, a defendant "charged with abduction . . . and another crime that factually includes restraint [or asportation] of the victim (e.g., rape or robbery)" as a matter of law cannot "be *convicted of both* unless the abduction-detention [or abduction-asportation] is factually distinct from the restraint inherent in the other crime."

Walker v. Commonwealth, 47 Va. App. 114, 123, 622 S.E.2d 282, 286-87 (2005) (quoting Roger D. Groot, Criminal Offenses & Defenses in Virginia at 3 (5th ed. 2005)).

- 11 -

When considering whether an abduction is incidental to another crime, this Court considers several factors, including the length of time that the victim was detained, the timing of the abduction and the other crime, the connection between the abduction and the other crime, and the additional danger to the victim created by the detention. Wiggins v. Commonwealth, 47 Va. App. 173, 182-83, 622 S.E.2d 774, 778-79 (2005); Hoyt, 44 Va. App. at 494, 605 S.E.2d at 757 (quoting Gov't of Virgin Islands v. Berry, 604 F.2d 221, 227 (3rd Cir. 1979)). See also Powell v. Commonwealth, 261 Va. 512, 541, 552 S.E.2d 344, 360-61 (2001) (upholding conviction for abduction as more than necessary to accomplish rape where the defendant ordered the victim to go to a more secluded part of her home and bound and detained her for a lengthy period of time); Brown, 230 Va. at 314, 337 S.E.2d at 714 (holding that the degree of "force and intimidation" used to detain the victim was "separate and apart from the restraint inherent in the commission of the rape"); Bell, 22 Va. App. at 97, 468 S.E.2d at 116 (pulling victim around to side of the car and making her lie face down on sidewalk were acts of restraint, asportation, and avoidance of detention "separate and apart from the restraint inherent in either the sexual assault or the robbery"); Phuong v. Commonwealth, 15 Va. App. 457, 462, 424 S.E.2d 712, 715 (1992) (abduction conviction upheld because it involved restraint greater than that "inherent in the act of robbery" where the defendant bound one victim and transported him to another floor of the house and tied another victim to a bed and covered her with a blanket). Considering these factors, we conclude that the abduction-detention and abduction-asportation of the victim were factually distinct from the restraint inherent in the perpetration of the rape. Here, appellant forced the victim to walk with him through her house twice. He then threw her on the bed and sliced her arm and fingers with a knife. He subsequently sexually assaulted her.

Appellant argues that the extent and duration of his asportation of the victim was slight. However, when appellant moved the victim away from the sliding door, he hindered her ability

to escape. Appellant further argues that the victim "did not testify to any detention once she was in the bedroom beyond that necessary for the intruder to commit the charged rape." Appellant overlooks the fact that appellant threw the victim down on the bed and that he had cut the victim's arm and fingers prior to raping her. These acts were certainly a use of force far in excess of that inherent in the commission of rape. These acts "increased the danger created by the detention," for merely cutting the victim, who was an elderly woman, seriously harmed her. Accordingly, the asportation and detention of the victim were not inherent or necessary to the restraint required to sexually assault her.

Appellant also argues "given [appellant's] insistence that [the victim] give him money, the reasonable inference is that the asportation was accomplished to facilitate the robbery contemplated by the intruder at the time of the entry." Essentially, appellant argues that he did not possess the requisite intent to defile the victim while he was forcing her to walk around her home and cutting her arm and fingers. Again, we disagree with appellant.

"'Intent is a state of mind that may be proved by an accused's acts or by his statements and that may be shown by circumstantial evidence.'" Wilson v. Commonwealth, 249 Va. 95, 101, 452 S.E.2d 669, 673-74 (1995) (quoting Wright v. Commonwealth, 245 Va. 177, 193, 427 S.E.2d 379, 390 (1993)). "The specific intent to commit rape may be inferred from the conduct of the accused if such intent flows naturally from the conduct proven." Id. at 101, 452 S.E.2d at 674 (citing Green v. Commonwealth, 223 Va. 706, 711, 292 S.E.2d 605, 608 (1982)). "Where the conduct of the accused under the circumstances involved points with reasonable certainty to a specific intent [to defile], the intent element is established." Id. (citing Green, 223 Va. at 711, 292 S.E.2d at 608-09). The evidence shows that appellant forced the victim to walk with him to her bedroom, where he threw her down on the bed. He then proceeded to inflict wounds that

would later require stitches prior to raping her.  As a matter of law, the evidence and the inferences therefrom are sufficient to support a finding that appellant intended to rape the victim.

### C.  Burglary while armed with a deadly weapon

Finally, appellant contends the jury erred in concluding the evidence was sufficient to prove he was armed with a deadly weapon when he entered the victim's home.

> Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom.  We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  "A trial court's judgment approving a jury's verdict is entitled to great weight on appeal, and will not be disturbed unless it is contrary to law or plainly wrong."  Gray v. Commonwealth, 233 Va. 313, 344, 356 S.E.2d 157, 174 (1987).  Moreover,

> [w]e have held that "circumstantial evidence is competent and is entitled to as much weight as direct evidence[,] provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt."  Dowden v. Commonwealth, 260 Va. 459, 468, 536 S.E.2d 437, 441 (2000).  "Circumstantial evidence is not viewed in isolation.  While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."  Muhammad v. Commonwealth, 269 Va. 451, 479, 619 S.E.2d 16, 32 (2005).

Finney v. Commonwealth, 277 Va. 83, 89, 671 S.E.2d 169, 173 (2009).

Here, the evidence showed that appellant admitted to the police that he obtained the knife from another home.  He entered the victim's home by passing through the screened-in porch, and a police officer testified at trial that it appeared that the screen had been cut.  Moreover, the victim watched appellant enter her home.  She was with him as he forced her to walk around her home and into her bedroom.  Finally, a knife was recovered near the victim's keys, which were

laying in a neighbor's yard.  It is a reasonable inference that the recovered knife was the knife used to attack the victim.  The victim testified that the recovered knife did not belong to her.

Under the circumstances, we cannot say that the jury's finding that appellant entered the victim's home armed with a knife was plainly wrong.

## III.  CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed.</u>